Christopher A. Nedeau (*Pro Hac Vice pending*)
Veronica L. Harris (*Pro Hac Vice pending*)
Natasha Saggar Sheth (*Pro Hac Vice pending*)
Catherine F. Ngo (*Pro Hac Vice pending*)
NOSSAMAN LLP
50 California Street
San Francisco, CA  94111
Telephone: (415) 398-3600
Facsimile:  (415) 398-2438
CNedeau@nossaman.com
VHarris@nossaman.com

Wayne A. Mack (*Pro Hac Vice pending*)
Lawrence H. Pockers (PA84589)
Robert M. Palumbos (*Pro Hac Vice pending*)
Andrew R. Sperl (*Pro Hac Vice pending*)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone:  (215) 979-1152
Facsimile:   (215) 979-1020
WAMack@duanemorris.com

Attorneys for Plaintiff
INSULATE SB, INC.

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INSULATE SB, INC., a California Corporation, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ABRASIVE PRODUCTS & EQUIPMENT; ADVANCED FINISHING SYSTEMS, INC.; AIR POWER, INC.; AIRTECH SPRAY SYSTEMS; BARNHARDT | Civil Action No. _____<br><br>CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES<br><br>JURY TRIAL DEMANDED |

MANUFACTURING COMPANY;
CAROLINA EQUIPMENT & SUPPLY
CO. INC. (CESCO INC.); C.H. REED,
INC.; C.J. SPRAY INC.; CLEMTEX,
INC.; COAST INDUSTRIAL
SYSTEMS, INC.; COATINGS
HOLDINGS, LTD.; CORROSION
SPECIALTIES, INC.; DEMILEC
(USA), LLC; DOVE EQUIPMENT
CO., INC.; ENDISYS FLUID
DELIVERY SYSTEMS; F&S
EQUIPMENT AND SUPPLIES, INC.;
GOLDEN STATE PAINT
CORPORATION; GRACO, INC.;
GRACO MINNESOTA, INC.;
HYDRAFLOW EQUIPMENT CO.;
JACK DE MITA, in his Individual
Capacity; INTECH EQUIPMENT &
SUPPLY, LLC; MARCO GROUP
INTERNATIONAL, INC. (MARCO);
MCC EQUIPMENT & SERVICE
CENTER; MIDWAY INDUSTRIAL
SUPPLY**;** NORTH CAROLINA FOAM
INDUSTRIES (NCFI
POLYURETHANES);  SPECIALTY
PRODUCTS, INC.; SPRAY FOAM
NATION (REGISTERED UNDER
ENERGY INDEPENDENCE INC.);
SPRAY FOAM SYSTEMS, LLC;
SPRAY PUMP, INC.; SPRAY-QUIP,
INC.; THE PAINT PROJECT;
ULTIMATE LININGS, LTD.;
URETHANE SUPPLY COMPANY
(REGISTERED UNDER SIGNAL
VENTURES INC.)

Defendants.

## CLASS ACTION COMPLAINT

## INTRODUCTION AND SUMMARY OF COMPLAINT

1.     Insulate SB, Inc. ("Insulate," or "Plaintiff"), individually and on behalf of all others similarly situated (collectively, the "Class," "Contractors," or "Plaintiffs"), by and through their undersigned attorneys, brings this class action against Graco Inc. and Graco Minnesota, Inc. (collectively "Graco"), and its co-conspirator distributors, some of whom are named below, ("Distributors") (collectively "Defendants") under the antitrust laws of the United States for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Section 3, 4, 7 and 16 of the Clayton Act (15 U.S.C. § 14, 15, 18, and 26) as well as under various states' laws.

2.     This Class Action Complaint ("Complaint") arises from Defendants' illegal and anticompetitive conduct in connection with the market for the manufacture and sale of fast-set spray foam equipment ("FSE" or "fast-set equipment").

3.     Graco manufactures and sells industrial equipment, including fluid-handling systems and components that move, measure, control, dispense, and apply fluids and viscous materials.

4.     Graco manufactures, in addition to other things, fast-set equipment used primarily by Contractors most often for the installation of foam insulation in

residential and commercial buildings, and to apply polyurea coatings to protect structures such as bridges, holding tanks, pipelines, and marine hulls.

5.      The Class, which is defined more fully below, is made up of Contractors and all others who purchased fast set equipment from Defendants for end use and not for resale.

6.      In April, 2013, the Federal Trade Commission ("FTC") filed a complaint alleging that  Graco violated the antitrust laws by buying  its two closest competitors in the FSE market, Gusmer Corp. and GlasCraft, Inc., leaving the market almost entirely in Graco's hands.   The FTC complaint further alleged that after the acquisitions, Graco raised prices for its FSE products, reduced product options, reduced innovation, and raised barriers to entry for firms seeking to compete with Graco, by taking steps to ensure that its distributors would distribute only Graco's products.

7.      Prior to issuing a complaint, the FTC must have "reason to believe" that a violation has occurred and a proceeding to remedy that violation is in the public interest. See 15 U.S.C. 45 (b). Therefore, the FTC had reason to believe that Graco had been using an unfair method of competition affecting FSE commerce.

8.      At the same time that it announced the complaint against Graco, the FTC announced that Graco had executed a Consent Agreement.  The FTC also issued a Decision and Order against Graco that, *inter alia*, required it to cease and

desist from inviting, entering into, and implementing exclusivity policies with its distributors.

9.     Graco has artificially maintained anticompetitive prices by conspiring with Distributors to block Graco's actual or potential competitors from access to the distribution channels and by vertically fixing prices in the FSE market. Defendants' actions constitute a continuing violation of the antitrust laws, a restraint of trade and commerce, and an unlawful maintenance of a monopoly.

10.     Defendants' actions denied manufacturers, who are competitors and/or potential competitors of Graco the ability to effectively and meaningfully distribute their products.  Defendants achieved this by unilaterally abusing its monopoly power to exclude actual and potential competitors from the FSE market and by conspiring individually and collectively with Distributors to exclude actual and potential competitors from the FSE market.  Distributors also conspired among themselves to exclude actual and potential competitors from the FSE market. Defendants also fixed the prices of FSE available to Plaintiff.  All of these acts unlawfully limited the choice among brands of FSE available to Plaintiff, and raised or unlawfully maintained the prices of FSE charged to Plaintiff, all of which has resulted, and is still resulting in, harm to Plaintiff by virtue of the fact that they have been overcharged for fast-set equipment.  Moreover, the conduct complained

of is not economically necessary in order for Graco or the Distributors to compete in the FSE market.

11.     The allegations herein are based upon information and belief, the investigation of Plaintiff's counsel, publicly available information and data, redacted documents in a related action, and the Complaint, Decision and Order and related materials filed by the FTC on or about April 17, 2013.

## JURISDICTION AND VENUE

12.     The claims set forth in this Complaint arise under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), seeking injunctive relief and/or damages under Sections 3, 4, 7 and 16 of the Clayton Act (15 U.S.C. §§ 14, 15, 18 and 26); and to recover damages, disgorgement, and/or restitution under state antitrust and consumer protection laws, and to recover the costs of suit, including reasonable attorneys' fees, expert fees and other allowable expenses, for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendants' violations of those laws.

13.     The Court has subject matter jurisdiction over the federal antitrust claims under 28 U.S.C. §§ 1331 and 1337.  The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.  The Court also has alternative subject matter jurisdiction over the state law claims under 28 U.S.C.

§ 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

14.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because at least one defendant resides, transacts business, or is found within this judicial district, and a substantial part of the events giving rise to the claims arose within the bounds of this judicial district.

## EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

15.     The activities of the Defendants, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.  Defendants' conspiracy also substantially affected commerce in Pennsylvania, California, and other states, and accordingly, Defendants and their co-conspirators have availed themselves of such laws as well as the laws of each and every state and territory of the United States.

16.     Defendants' conspiracy substantially affected commerce in each of the states identified herein.  Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the manufacturing, distribution, and pricing of FSE.  Defendants produced, promoted, sold, marketed, and/or distributed FSE in each of the states

identified herein, thereby purposefully profiting from access to Contractors in each such state.  As a result of the activities described herein, Defendants:

(a) Caused tortious damage to the residents of the states identified herein;

(b) Caused tortious damage in each of the states identified herein by acts or omissions committed outside each such state by regularly doing or soliciting business in each such state;

(c) Engaged in persistent courses of conduct within each such state and/or derived substantial revenue from the marketing of FSE in each such state (and services relating to such marketing); and

(d) Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state and/or deriving substantial revenue from the marketing of FSE (and services relating to such marketing) in each such state.

17.    The conspiracy described herein affected adversely every person in each of the states identified in this Complaint who bought FSE manufactured by Graco for end use and not for resale.

18.    Defendants' conspiracy has lasted for many years and resulted in monetary damages to purchasers in each state identified herein.

19.     Prices of FSE in each state can be and have been manipulated by conspirators within that state, outside of it, or both.  Without enforcing the antitrust and/or consumer protection laws of each of the states identified herein, companies that break the law may go unpunished.  Defendants knew that commerce in each of the states identified herein would have to be adversely affected in order to implement their conspiracy.

## THE PARTIES

### Plaintiff

20.     Plaintiff Insulate is a fast-set contractor that is incorporated in the State of California.  During the Class Period described below, Insulate purchased fast-set equipment from, among others, Defendant Intech Equipment & Supply, L.L.C., and was injured by paying higher prices due to Defendants' illegal conduct described herein.

### Defendants

21.     Defendant Abrasive Products & Equipment ("APE") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Harvey, Louisiana.  APE is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

22.     Defendant Advanced Finishing Systems, Inc. ("AFS") is a corporation organized under the laws of the State of Oregon, with its principal place of

business in Portland, Oregon.  AFS is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

23.    Defendant Air Power, Inc. is a corporation organized under the laws of the State of North Carolina, with its principal place of business in High Point, North Carolina.  Air Power, Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

24.    Defendant Airtech Spray Systems is a corporation organized under the laws of the State of Texas, with its principal place of business in Dallas, Texas. Airtech Spray Systems is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

25.    Defendant Barnhardt Manufacturing Company is a corporation organized under the laws of the State of North Carolina, with its principal place of business in Charoltte, North Carolina.  Barnhardt Manufacturing Company, through its division North Carolina Foam Industries (NCFI Polyurethanes), is a fast-set equipment distributor who distributed and sold FSE during the Class Period.  Defendant NCFI is a corporation organized under the laws of the State of North Carolina, with its principal place of business in Mount Airy, North Carolina. NCFI is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

26.     Defendant Carolina Equipment & Supply Co. Inc. ("CESCO Inc.") is a corporation organized under the laws of the State of South Carolina, with its principal place of business in North Charleston, South Carolina.  CESCO Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

27.     Defendant C.H. Reed, Inc. is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Hanover, Pennsylvania.  C.H. Reed, Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

28.     Defendant C.J. Spray Inc., is a corporation organized under the laws of the State of Minnesota, with its principal place of business in Saint Paul, Minnesota.  C.H. Reed, Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

29.     Defendant Clemtex Inc. is a corporation organized under the laws of the State of Texas, with its principal place of business in Houston, Texas.  Clemtex Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

30.     Defendant Coast Industrial Systems, Inc. is a corporation organized under the laws of the State of California, with its principal place of business in San

Diego, California.  Coast Industrial Systems, Inc is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

31.    Defendant Coatings Holdings, Ltd is a limited liability corporation organized under the laws of the State of Wisconsin, with its principal place of business in Green Lake, Wisconsin.  Coatings Holdings, Ltd is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

32.    Defendant Corrosion Specialties, Inc. is a corporation organized under the laws of the State of Georgia, with its principal place of business in Duluth, Georgia.  Corrosion Specialties, Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

33.    Defendant Demilec (USA), LLC is a limited liability corporation organized under the laws of the State of Texas, with its principal place of business in Arlington, Texas.  Demilec (USA), LLC  is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

34.    Defendant Dove Equipment Co., Inc. is a corporation organized under the laws of the State of Illinois, with its principal place of business in East Peoria, Illinois.  Dove Equipment Co., Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

35.    Defendant EnDiSys Fluid Delivery Systems ("EnDiSys") is a corporation organized under the laws of the State of Minnesota, with its principal

place of business in Rogers, Minnesota.  EnDiSys Fluid Delivery Systems is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

36.     Defendant F&S Equipment and Supplies, Inc. is a corporation organized under the laws of the State of Alabama, with its principal place of business in Birmingham, Alabama.  F&S Equipment and Supplies, Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

37.     Defendant Golden State Paint Corporation is a corporation organized under the laws of the State of California, with its principal place of business in Torrance, California.  Golden State Paint Corporation is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

38.     Defendant Graco Inc. is a corporation organized under the laws of the State of Minnesota with its principal place of business in Minneapolis, Minnesota. Graco Minnesota, Inc. is a corporation organized under the laws of the State of Minnesota with its principal place of business in Minneapolis.  Graco conspired with Defendant distributors (described below) to artificially maintain anticompetitive prices of FSE and to block actual or potential competitors from entering the FSE market.

39.     Defendant Hydraflow Equipment Company is a corporation organized under the laws of the State of Missouri, with its principal place of business in St.

Louis, Missouri.  Hydraflow Equipment Company is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

40.     Defendant Jack William DeMita, an individual, is a resident of Fairlawn, Ohio.  He was the Chief Operating Officer for CPi-Construction Polymers International, Inc. (CPi) a corporation organized in July 2006 under the laws of the State of Ohio, with its principal place of business in Barberton, Ohio. CPi was a fast-set equipment distributor who distributed and sold FSE during the Class Period.  CPi ceased operations on or about December 18, 2010.

41.     Defendant Intech Equipment & Supply, L.L.C. ("Intech") is a limited liability corporation organized under the laws of the State of Arizona, with its principal place of business in Phoenix, Arizona.  Intech is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

42.     Defendant Marco Group International, Inc. ("Marco") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Davenport, Iowa.  Marco is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

43.     Millennium Custom Coatings, Inc or MCC Equipment & Service Center ("MCC") is a corporation organized under the laws of the State of Indiana, with its principal place of business in Indianapolis, Indiana.  MCC is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

44.     Defendant Midway Industrial Supply is a corporation organized under the laws of the State of Wisconsin, with its principal place of business in Mountain View, Minnesota.  Midway Industrial Supply is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

45.     Defendant Specialty Products, Inc. ("SPI") is a corporation organized under the laws of the State of Washington, with its principal place of business in Lakewood, Washington.  SPI is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

46.     Defendant Spray Foam Nation (registered under Energy Independence Inc.) is a corporation organized under the laws of the State of New York, with its principal place of business in West Haven, Connecticut.  Spray Foam Nation is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

47.     Defendant SprayFoam Systems, LLC is a limited liability corporation organized under the laws of the State of Georgia, with its principal place of business in Greensboro, Georgia.  SprayFoam Systems, LLC is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

48.     Defendant Spray Pump, Inc. is a corporation organized under the laws of the State of Texas, with its principal place of business in Baytown, Texas.

Spray Pump, Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

49.     Defendant Spray-Quip, Inc. is a corporation organized under the laws of the State of Texas, with its principal place of business in Houston, Texas. Spray-Quip, Inc. is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

50.     Defendant The Paint Project is a corporation organized under the laws of the State of Massachusetts, with its principal place of business in Medfield, Massachusetts.  The Paint Project is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

51.     Defendant Ultimate Linings, Ltd is a limited liability corporation organized under the laws of the State of Texas, with its principal place of business in Houston, Texas.  Ultimate Linings, Ltd is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

52.     Defendant Urethane Supply Company (registered under Signal Ventures Inc.) is a corporation organized under the laws of the State of Alabama, with its principal place of business in Rainsville, Alabama.  Urethane Supply Company is a fast-set equipment distributor who distributed and sold FSE during the Class Period.

## FACTUAL ALLEGATIONS

## The Market For Fast-Set Equipment

### Background

53.    The relevant product market is the market for the manufacture and sale of fast-set equipment for use by Contractors.

54.    Fast-set equipment is high-pressure, two-component equipment, which is primarily used by Contractors to apply fast-set spray polyurethane foam, polyurea coatings, and certain epoxies.

55.    Spray polyurethane foam is a compound created when two chemicals, isocyanates and polyols, combine.  When correctly blended, the chemical reaction creates a polyurethane foam that sets up very quickly.  Such foam often is called "fast-set" foam, and the spray equipment used to mix and apply it is often called fast-set equipment or FSE.

56.    The essential components of a complete fast-set equipment system are: (1) the proportioner, which controls the ratio, temperature, and flow of the chemicals; (2) heated hoses, which independently maintain the fast-set chemicals at proper temperature; and (3) the spray gun, which is specially designed to mix and to dispense polyurethane foams and polyurea coatings.  A manufacturer that produces or supplies a complete system of fast-set equipment is generally considered to be a full-line manufacturer.

57.     Fast-set equipment includes each aspect of a complete system as well as spare and replacement parts.

58.     The predominant use of spray polyurethane foam is as insulation in residential and commercial buildings.

59.     While more expensive than fiberglass or cellulose insulation to purchase, when equivalently applied, spray polyurethane foam has superior insulating capabilities.

60.     Spray polyurethane foam when used as insulation can significantly reduce the cost of heating and/or cooling buildings and can substantially reduce the amount of energy needed to heat or cool a building.

61.     Spray polyurethane foam is considered to be a "green" technology, and the use of it can save building owners substantial amounts of money off their energy bill and can help the United States reduce its dependency on foreign oil.

62.     By artificially maintaining anticompetitive prices for fast-set equipment, Defendants have limited the ability of contractors to become spray foam contractors and have limited the amount of equipment that spray foam Contractors have been able to purchase.

**Meaningful Competition Requires Access To The Established FSE Distribution Channel**

63.     Fast-set equipment manufacturers sell their products almost exclusively through a specialized, third-party distribution channel, which consists of distributors acting as intermediaries between the manufacturer and Contractors.

64.     As the FTC recently stated, a robust network of third-party fast-set equipment distributors is necessary for any manufacturer to meaningfully compete in the FSE market.

65.     Fast-set equipment manufacturers do not sell competitively significant quantities of equipment directly to end-users.

66.     Fast-set equipment distributors meet end-user demand for a convenient and nearby source of expertise, training, spare parts, repair services, and in some instances chemical supplies.

67.     Distributors generally have close and long-term customer relationships with the Contractors who buy fast-set equipment.

68.     Prior to Graco's acquisitions of its competitors, Distributors carried multiple manufacturers' product.

**There Is No Cross-Elasticity of Demand**

69.     There is no cross-elasticity of demand between fast-set equipment and other products.  There is no cross elasticity of demand because, as detailed in the

following sections, other products such as non-spray-foam insulation, reaction injection molding equipment, and self-contained, compact spray foam products are not functionally interchangeable with fast-set equipment, and thus, are not reasonable substitutes.

70.     If demand between fast-set equipment and other products were cross-elastic, then one potential consequence would be that Graco's acquisition of a monopoly of the fast-set equipment market, would not have led to the ability to raise prices.  Buyers could have moved to the other products if they were reasonable substitutes.  Because the other products are not substitutes there is no cross elasticity of demand and Graco was able to raise prices without buyers moving to other products.  In other words, because fast-set equipment is the relevant market, the existence of other products did not foreclose Graco's ability to increase prices.

71.     Graco's accumulation of monopoly power in the fast-set market has enabled Graco to increase prices well above a standard benchmark, the Producer Price Index ("PPI"), but in more competitive markets for other products, upon information and belief, Graco's prices tracked the PPI.

72.     While Graco's FSE market share has been steadily growing, its gross margins have also been simultaneously growing.  Further this indicates that demand for fast-set equipment is not cross-elastic with other products.  In a

competitive market, margins are expected to decrease, not increase.  Graco's

increased market share in fast-set equipment, coupled with higher margins,

indicates that it is not constrained by any cross-elasticity of demand with other

products.

73.     Graco was able to increase prices throughout the economic recession,

without losing market share, even though the FSE end users, the Contractors, were

some of the hardest hit by the recession.

74.     The existence of a fast-set equipment market is admitted in Graco's

documents and in the way Graco operates its business.

**Fiberglass and Other Insulation Is Not a Reasonable Substitute For FSE**

75.     Fast-set equipment is not functionally equivalent to any type of

insulation, including Fiberglass or cellulose.  FSE is equipment that generates and

is used to install a particular type of insulation (spray-foam insulation), while

insulation is simply insulation and not equipment.  For example, a contractor might

only need a hammer to install fiberglass insulation but to install spray-foam

insulation, he or she would need the expensive and overpriced fast-set equipment

sold by Graco.

76.     The end user of insulation is the residential or commercial building

owner who purchases the insulation.  The end user of fast-set equipment is the

Contractor, who purchases fast-set equipment, so that he or she may sell products the equipment generates and installs.

77.    Insulation, such as fiberglass and cellulose are not reasonable substitutes for FSE.

## RIM (IPPE) Equipment Is Not A Reasonable Substitute For FSE

78.    Reaction injection molding ("RIM") equipment is used to pour slow-setting polyurethane foam into a mold to create a variety of products in a factory setting.  It is also called In-plant Polyurethane Processing Equipment ("IPPE").

79.    RIM equipment is generally far larger, more expensive, and more sophisticated than fast-set equipment.

80.    Unlike fast-set equipment, RIM equipment is used at a fixed manufacturing location and is not portable.

81.    It is typically used in factories to make consumer goods such as Nerf footballs, upholstery, and automotive seating.

82.    RIM equipment is not functionally interchangeable for the same uses as fast-set equipment.

## Self-Contained, Compact Spray-Foam Products Are Not A Reasonable Substitute For FSE

83.    There is a group of products that spray fast-setting polyurethane foam, but which do not substitute for the fast-set equipment sold by Defendants.

84.     An example of this type of product is the "Froth-Pak."  These are compact products, very different from the fast-set equipment: (1) Froth-Pak is more suitable for the do-it-yourselfer than for high volume contractor jobs.  If purchased by contractors at all, the purchase would be in addition to, not instead of, fast-set equipment; (2) the cost to use Froth-Pak is much higher, making it economically infeasible for large installations; (3) because Froth-Pak is low pressure and lacks heated hoses, it cannot be used for jobs where the tanks must be located remotely from the spray gun; and (4) unlike fast-set equipment, the output from a Froth-Pak is not customizable.

85.     These differences render Froth-Pak an unreasonable substitute for the FSE sold by Graco or other FSE manufacturers.  Other "low pressure" products are similarly not reasonable substitutes for fast-set equipment.

**The Relevant Geographic Market is North America**

86.     The relevant geographic market consists of the area to which purchasers can practicably turn for supplies.

87.     North America is a relevant geographic market for the sale of fast-set equipment.

88.     As discussed in more detail below, Contractors purchase fast-set equipment overwhelmingly through distributors that can provide them with a combination of goods and services.  It is not practical for buyers in North America

to turn to foreign manufacturers or distributors, certainly not in a material way, unless those suppliers have a meaningful distribution presence in North America.

89.     In response to price increases by Graco, Contractors cannot practicably turn, and have not, in fact, turned to sources outside North America, and certainly not in sufficient numbers, to defeat the anticompetitive price increases or make Graco's price increases unprofitable.  The existence of overseas suppliers is substantially irrelevant to Contractors conducting business in the Northern American market for FSE.

90.     Moreover, upon information and belief, Graco, in its internal record keeping, tracked the North American FSE market separately from other geographical markets.

91.     Alternatively, even if the relevant geographic market were worldwide (which it is not), Graco's market share, would still be sufficiently high to warrant an inference of monopoly power.

**Graco Systematically Bought All Competitors and Established a Monopoly**

92.     Before Graco's acquisitions, fast-set equipment distributors historically carried multiple manufacturers' brands.

93.     Graco's actions after the acquisitions resulted in higher prices and fewer product choices for Contractors, and created an opportunity for other manufacturers to enter and expand in the relevant market.

94.     But following Graco's acquisition of GlasCraft, Graco, in league with its Distributor co-conspirators, initiated several strategies that reduced any prospective entrant's access to the established channel required for meaningful competition in the FSE market.

95.     Upon information and belief, Graco agreed with its Distributors to raise their discount and inventory thresholds, which reduced Distributors' willingness and ability to carry the products of new entrants.

96.     Also Graco agreed with its Distributors individually and collectively to enter into exclusive dealing arrangements for the purpose of keeping new and potential entrants out of the FSE market.

97.     Graco's overwhelming market share after its acquisition of all significant competitors made it unprofitable for Distributors to withdraw from the scheme and conspiracy to exclude new entrants.

98.     Given distributors' reliance on Graco post-acquisition, these actions further heightened barriers to entry in the relevant market.

**Graco and Distributors Conspired To Boycott and Exclude Competition**

99.     In 2007, former Gusmer owners and employees, operating through PMC, Garraf Maquinaria S.A., and Gama Machinery USA, Inc. (now Polyurethane Machinery Corp.) ("Gama/PMC") sought to enter the FSE market.

100.   Initially, Gama/PMC sold equipment made by a foreign manufacturer, but in 2009, began selling its own products.

101.   In March 2008, Graco initiated a lawsuit in the federal District Court of New Jersey ("the Gama/PMC litigation") alleging, among other things, theft of trade secrets and breach of contract.

102.   Because Graco viewed Gama/PMC as a threat to its monopoly power in the FSE market, Graco, with each of its Distributors, individually and collectively, reaffirmed the agreement and conspiracy to exclude new entrants from entering the FSE market.

103.   Upon information and belief, Graco's conspiracy with individual distributors as well as the Distributors' collective agreement to enforce Graco's anticompetitive exclusion of new entrants, prevented any commercially meaningful distributorship of fast-set equipment sold by Gama/PMC.

104.   Upon information and belief, Graco agreed with each of its Distributors individually to exclude new entrants such as Gama/PMC from the FSE market.

105.   Upon information and belief, the Distributors collectively agreed to and conspire with one another to exclude new entrants, such as Gama/PMC from the FSE market.

106.   Upon information and belief, the Distributors collectively agreed to aid and abet Graco in its scheme to exclude new entrants from the FSE market.

107.   The vast majority of sales in the relevant market are sold by a discrete group of key Distributors.

108.   These key Distributors, as well as other FSE Distributors, know and communicate with one another at industry conferences and otherwise.

109.   It was widely known among Distributors that Graco wanted to exclude new entrants from coming into the FSE market.

110.   Upon information and belief, distributors collectively agreed to conspire with one another to comply with anticompetitive agreements that each of the Distributors had separately entered into with Graco.

111.   But for Distributors' collective conspiracy to agree with Graco's anticompetitive exclusion of new entrants from the FSE market, Graco would not have been successful in implementing its anticompetitive scheme to exclude potential and actual new entrants from the FSE market, such as Gama/PMC.

112.   The Distributors were economically motivated to join and enforce the conspiracy to exclude new entrants in the FSE market, because the conspiracy enabled Distributors to: charge Contractors anticompetitive prices for fast-set equipment, and control geographic distribution areas and exclude new distributors from such areas, who might be willing to sell new entrants' products.

113.   Incumbent distributors cannot afford to take on a new competitive line, if they risk the loss of access to Graco's products, and new entrants cannot compensate the distributors to make such a switch.

114.   Graco sought out the advice and consultation of some of its key Distributors on how best to reinforce the Distributors' individual and collective agreements to participate in the scheme to exclude new entrants, such as Gama/PMC from the FSE market.

115.   In October 2007, after consulting with some of its key Distributors, concerning the most effective means of reaffirming a boycott against new entrants, such as Gama/PMC, Graco sent a letter (the "Boycott Agreement Letter") to North American fast-set equipment Distributors.  In that letter, Graco purported to use a "best efforts" clause in the distributorship agreements between Graco and each of its Distributors to remind them of the consequences of not continuing to abide by each of their agreements to exclude new entrants, such as Gama/PMC, from the FSE market:

> Should a distributor add a competitive product line, it will result in an immediate review of our business relationship and may impact access to specific products, changes in addendum status or possible elimination of our distributor agreement.

116.   Gama/PMC employees had excellent contacts at many of the FSE Distributors.

117.   Despite repeated efforts to obtain access to on FSE Distributor, Gama/PMC was repeatedly told by Distributors that they would not carry Gama/PMC because of their exclusive arrangements with Graco.

118.   Many of the Distributors admitted to Gama/PMC that the products being marketed by Gama/PMC were more innovative, more reliable, better quality, and/or lower priced than Graco's products.

119.   For example, the Gama/PMC products were a throw-back to types of fast-set equipment that was more durable, more reliable, easier for Contractors to maintain and repair themselves, and produced higher quality and more consistent results compared to Graco's products, which were less durable and contained complex electronics that required expensive repairs by service professionals.

120.   Such products were extremely desirable to many Contractors.

121.   After acquiring all of its competitors, Graco pulled fast-set equipment, similar to that of Gama/PMC's, off the market, requiring Contractors to up-grade to more expensive, less durable, and expensive-to-repair fast-set equipment.

122.   Though initially unwilling to breach its agreement with its fellow Distributors and with Graco to enforce the boycott of new entrant, one of Graco's key distributors decided to entertain the possibility of withdrawing from the conspiracy by agreeing to distribute Gama/PMC fast-set equipment.

123.   In or around 2007, New Jersey-based Foampak, Inc. ("Foampak"), and its President, Chris Donaghy communicated to fellow distributors and Graco that it was considering carrying Gama/PMC fast-set equipment in addition to Graco equipment.

124.   After communications with fellow Distributors and Graco, Foampak decided not to withdraw from the conspiracy and instead assisted Graco in drafting the Boycott Agreement Letter to fellow Distributors.

125.   Nevertheless, Foampak, believing that its customer Contractors deserved a choice in the fast-set equipment market, in 2009, again contemplated withdrawing from the conspiracy and told fellow Distributors and Graco that it was again considering distributing Gama/PMC fast-set equipment.

126.   Upon information and belief, fellow Distributors discouraged Foampak from withdrawing from the conspiracy.  And Graco flew two of its top executives across the country from Minnesota, where Graco is headquartered, to New Jersey to meet with Chris Donaghy and a fellow employee of Foampak at a local Holiday Inn.

127.   At that meeting in January 2009, Graco executives delivered the following message:

> [I]f you do take on the Gama line, you will immediately lose
> your . . . discounts and then receive a letter notifying you of 60-day

termination of your Graco distributorship. . . .  There will be NO
combined Graco and Gama distributorships, EVER. . . .

128.   Considering it a better decision for its business, Foampak acquiesced
and did not withdraw from the boycott and conspiracy to exclude new entrants
such as Gama/PMC.

129.   Following its decision not to withdraw from the conspiracy, Foampak
became Graco's number one FSE distributor.

130.   Graco made sure that the other Distributors became aware that
Foampak did not withdraw from the conspiracy.

131.   As recently as February 2012, Graco sent a letter to Distributors
reminding them that, according to prior agreements, Distributors were not to carry
competitive products sold by Gama/PMC.

132.   At all relevant times, the Graco-Distributor boycott has been
successful and persistent.

133.   Upon information and belief, relegated to inefficient and fringe
avenues to market, such as direct sales and small or inexperienced distributors,
Gama/PMC has persistently lost money.

**Graco's Conspiracy with Distributors Constituted a Barrier To Entry**

134.   Entry into the relevant market has not been, and would not be, timely,
likely, or sufficient in magnitude, character, and scope to deter or counteract the
anticompetitive effects of the Graco's monopoly power.

135.   No significant entry has occurred since Graco's entry in 2002.

136.   There are significant entry barriers to the FSE market, which include, inter alia, brand reputation, installed base, and the difficulty in finding adequate third-party distributors.

137.   Graco has a massive installed base because it has been the overwhelmingly dominant seller for many years.  As a result, the vast majority of machines in the field are Graco machines (or those of the companies Graco has acquired).

138.   Upon information and belief, distributors of fast-set equipment make as much as 50% or more of their fast-set equipment revenue from the sale of repair and maintenance services (including warranty service) and spare parts.

139.   If a distributor has a customer with dozens of Graco machines, it receives tremendous amounts of revenue servicing and keeping those machines operational.  If it switches to a new entrant, however, and loses access to Graco fast-set equipment, it loses not only new product sales but sales for service and spare parts for the installed base.  The monopolistic overcharges that are built into spare-part prices has and continues to cause significant damage to Contractors.

140.   Neither better product quality nor lower prices would be enough to motivate a Graco distributor to leave the conspiracy.

141.   The most significant entry barrier is the need for specialized third-party distribution.  A fast-set equipment distributor needs to possess the technical expertise to teach Contractors to operate and maintain such equipment properly in accordance with the specifications established by equipment manufacturers and various chemical manufacturers.  Through its acquisitions, Graco has become the only remaining viable full-line manufacturer of fast-set equipment, giving it substantial control of the established fast-set equipment distribution channel in North America.

142.   Graco's agreements with Distributors, the Distributors' agreements between themselves to adhere to their agreements with Graco, Graco's increase of discount and inventory thresholds to Distributors, Graco's intimidation of Distributors who threaten to withdraw from the conspiracy, have substantially reduced prospective competitors' access to the installed base of fast-set equipment distributors and such access is a formidable barrier to FSE market entry, making "timely, likely, and sufficient" new entry into the market implausible.

143.   Spray foam insulation Contractors do not typically buy fast-set equipment directly from manufacturers.

144.   Sale of fast-set equipment has historically occurred almost universally through distributors, and there is no reasonable prospect for gaining a significant

market share without access to the incumbent distributor base.  This has been a well-known feature of the FSE market for many years.

145.   The development of new distributors is a poor, inefficient, and very slow substitute for access to the existing distributor base.  It has always been the distributors, not the manufacturers, who have the key customer relationships with the Contractors who buy fast-set equipment.  Without access to the distributors, whom the Contractors have been doing business with for years, a new entrant manufacturer is cut off from the most important and only effective means of getting its product in front of would-be buyers.

146.   Upon information and belief, Graco's documents will show that its market position is protected by high barriers to entry, including the distribution or "channel" barrier.  Graco makes all or almost all of its fast-set equipment sales through distributors.

147.   Prior to Graco's acquisition of its key competitors, it was commonplace for the major distributors of fast-set equipment to carry multiple brands, including those of the three leading companies: Gusmer, GlasCraft, and Graco.  Graco, however, as soon as it obtained monopoly power began to eliminate diversity and choice in the FSE market.

**Graco Had Monopoly Power**

148.   In 2005, Gusmer was the largest and most significant entity engaged in the manufacture and sale of a full line of fast-set equipment throughout North America and the world, with its principal place of business located in Lakewood, New Jersey.

149.   Graco acquired Gusmer in February 2005 for $65 million.

150.   The Gusmer acquisition increased Graco's share of the North American fast-set equipment market to over 65%.

151.   Following the acquisition of Gusmer, Graco closed Gusmer's fast-set equipment manufacturing facilities.

152.   Graco acquired GlasCraft in February 2008 for $35 million.

153.   The GlasCraft acquisition raised Graco's FSE market share of the North American fast-set equipment market to above 90%, and eliminated Graco's last significant North American competitor.

154.   Following the acquisition of GlasCraft, Graco closed GlasCraft's fast-set equipment manufacturing facilities.

155.   At the time, GlasCraft was the only competitor other than Graco engaged in the manufacture and sale of a full line of fast-set equipment throughout North America and the world, with its principal place of business located in Indianapolis, Indiana.

156.   Graco's acquisitions of Gusmer and GlasCraft substantially lessened competition, reduced product choice, and created a monopoly in the FSE market.

**Graco's Price Increases and Limitation of Product Choices Created an Opportunity for Competition, Which Graco Schemed To Crush in Order To Maintain Its Monopoly Power**

157.   Before Graco's acquisition of Gusmer, fast-set equipment manufactured by Gusmer and by Graco reflected different design philosophies.

158.   Gusmer's flagship model, the "H20/35," had long been the industry standard.  Its design, with a "low tech" control panel and accessible mechanical parts, made the Gusmer product repairable in the field, which greatly appealed to many contractors.

159.   Graco, on the other hand, took a more "high tech" approach, with sophisticated printed circuit controls and less accessible mechanical parts.  The trade-off was a machine that was harder and more expensive to repair, many times requiring the parts to be repaired off-site.

160.   When Graco acquired Gusmer, it made the Gusmer line of products obsolete.

161.   This forced buyers, many begrudgingly, to switch to the more expensive corresponding Graco models.

162.   Because some Contractors preferred the field-serviceable Gusmer equipment, Graco's actions created an opportunity for a new-market entrant.

163.   Graco also fired many former Gusmer employees, both in New Jersey and at Gusmer's European affiliate in Spain.

164.   In September 2007, PMC launched Gama, a New Jersey company, to act as master distributor of fast-set equipment manufactured by Garraf in Spain.

165.   The geographic distribution area was North America.

166.   That relationship between Garraf and Gama ended, but in October 2009, Gama designed, manufactured, and began selling equipment, which was designed to be easy and inexpensive to repair in the field.

167.   When Graco became aware that Gama/PMC would be attempting to enter the fast-set equipment market, it began communicating with its distributors to ensure that the conspiracy to boycott any new entrant would hold firm.

168.   Graco took the pulse of distributors and was assured by some that the threat of loss of a distributorship would be sufficient to hold the conspiracy together.

169.   Notwithstanding exceptionally attractive margins that should attract market entry, Graco has been able to exclude competition through its conspiracy with Distributors, which has restricted total market output and choices available to

buyers and at the same time artificially inflated and maintained the price of FSE at anticompetitive prices.

170.   Graco's conduct has harmed competition and Contractors by depriving new entrants meaningful access to the FSE market, which has restricted consumer choice and allowed Graco to charge anticompetitive prices and earn monopolistic profits from the Contractors who purchase Graco's fast-set equipment.

## Conspiracy

171.   This case involves multiple conspiracies.  First, there exists a hub-and-spoke conspiracy with Graco as the monopolist hub and with the agreements between Graco and its Distributors maintaining the spokes while the agreements among the Distributors to exclusively deal with only Graco maintaining the rim of the wheel.  Second, each of the exclusive agreements between Graco and each of its Distributors constitutes an independent conspiracy.  Third, Graco with each of the Distributors individually and collectively agreed to vertically fix the price of fast-set equipment.

172.   Graco's Distributors, some of whom are known to Plaintiff and are named Defendants herein, conspired separately with Graco and amongst themselves in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance thereof.

173.   Various other firms, corporations, partnerships and/or individuals, domestic and/or foreign, who are presently unknown to Plaintiff, participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance thereof.

174.   The acts charged in this Complaint have been done by some or all of Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's business or affairs.

175.   Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired or control through merger, acquisition, or otherwise.

### Fraudulent Concealment and Continuing Violations

176.   Plaintiff did not discover, and could not have discovered through the exercise of reasonable due diligence, Defendants' anticompetitive and conspiratorial conduct alleged herein, or the existence of the claims for relief alleged herein, at any time prior to April 2013 when the FTC filed its complaint against Graco.

177.   Because Defendants did not disclose the existence or and full nature of their anticompetitive conduct to Plaintiff, Plaintiff could not have reasonably

become aware of Defendants' unlawful conduct alleged herein at any time prior to April 2013.  Before that date, Plaintiff did not, and could not have, with the exercise of reasonable due diligence, become aware of the facts necessary to allege the claims for relief alleged herein, including the fact that they were paying artificially high prices for FSE as a result of Defendants' conduct.

178.   Defendants' affirmative acts alleged herein, including acts in furtherance of the conspiracy and/or conspiracies, were wrongfully concealed and carried out in a manner that precluded detection.

179.   Defendants formally entered into the conspiracy and/or conspiracies by, among other things, signing and agreeing to the terms of exclusive dealing arrangements, in addition to their exclusive dealing language.

180.   Defendants fraudulently concealed their participation in the conspiracy and/or conspiracies alleged herein by, inter alia, entering into exclusive dealing contracts and then engaging in actions to ensure that the contracts succeeded in eliminating Gama/PMC or any other actual or potential new entrant from the FSE market.  Defendants' actions were self-concealing in that they pushed customers away from Gama/PMC but never disclosed that their actions were part of a conspiracy and/or conspiracies to eliminate competition, specifically any new entrant such a Gama/PMC, from the FSE market.

181.   Although Plaintiff exercised all reasonable due diligence, Plaintiff had no knowledge of Defendants' unlawful self-concealing anticompetitive conduct. They could not have discovered Defendants' agreements and conspiracies, and the existence of the claims for relief alleged herein, at any time prior to April 2013, by the exercise of due diligence, because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of and fraudulently conceal their agreements and conspiracies.

182.   Upon information and belief, based on the facts revealed in the FTC complaint and the context of the redactions in the Gama/PMC litigation file, Graco concealed from Plaintiff the full extent and nature of Defendants' illegal conduct, including evidence of its monopolistic market share, by actively and aggressively causing evidence contained in the Gama/PMC litigation to be sealed from public view.

183.   None of the facts or information available to Plaintiff prior to April 2013, if investigated with reasonable due diligence, could or would have led to the discovery of the full extent and nature of the conspiracies and anticompetitive conduct alleged herein.

184.   As a result of Defendants' fraudulent concealment of their conspiracies, Plaintiff asserts the tolling of the applicable statute of limitations affecting Plaintiff's right of action.

185.   In addition, Defendants' illegal conspiratorial conduct and the harm it caused, as alleged above, is ongoing and has continued after the filing of Gama/PMC's antitrust counterclaim against Graco.

186.   Defendants' conspiracies and boycott occurred continuously throughout the Class Period, and continue to the present day, because Distributors continue to ensure that Gama/PMC's fast-set equipment is not available.

## CLASS ACTION ALLEGATIONS

187.   Plaintiff brings this action as a class action under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.  The class (the "Class") is defined as:

> all entities and individuals in the United States who purchased fast-set equipment manufactured by Graco for end use and not for resale from Graco or one of its Distributors during the period commencing February 1, 2005, until the effects of the anticompetitive conduct end ("Class Period").  Excluded from the Class are Defendants and any co-conspirator of Defendants, whether or not named as a defendant in this Complaint.

188.   The Class satisfies the requirements of Rule 23(a) - numerosity, commonality, typicality, and adequacy - and Rule 23(b)(3) - predominance and superiority - for the reasons set forth below.

189.   In addition, the Class satisfies Rule 23(b)(2) as Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory relief with respect to the class as a whole.

190.   The members of the Class are so numerous that joinder of all Class members is impracticable within the meaning of Rule 23(a)(1).  Due to the nature of the trade and commerce involved, the members of the Class are geographically dispersed throughout the United States, and joinder of all Class members would be impracticable.  While the exact number of the members of the Class is presently unknown, Plaintiff believes that there are thousands of members.  The names and addresses of the Class are in the possession of Defendants and can be readily ascertained through discovery.

191.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class within the meaning of Rule 23(a)(2).  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Among the questions of law and fact common to the Class are:

(a) whether the Distributors conspired with each other and with Graco collectively and/or separately to restrict the available supply of fast-set equipment and thereby restrain trade in violation of federal law;

(b) whether the Distributors conspired with each other and with Graco collectively and/or separately to enable Graco to establish and/or maintain a monopoly in the fast-set equipment market;

(c) whether Graco possesses monopoly power in the fast-set equipment market and, in combination with the Distributors, used unfair and anticompetitive practices to maintain its monopoly, which in turn, has led to an artificial limitation on the fast-set equipment brand choices available to the Class;

(d) whether the Class has sustained, and/or continues to sustain, damages in the nature of overcharges as a result of Defendants' wrongful conduct, and, if so, the quantum of such damages;

(e) the existence and duration of the illegal conduct alleged herein;

(f) whether Defendants concealed their unlawful activities;

(g) whether Defendants' anticompetitive conduct resulted in diminished competition for fast-set equipment;

(h) whether Defendants' anticompetitive conduct caused prices for fast-set equipment to be higher than it would have been in the absence of Defendants' conduct;

(i) whether Defendants' conduct violates the Clayton and Sherman Acts;

(j) whether Defendants' conduct violates the laws of the various states identified herein;

(k) whether Plaintiff and the member of the Class are entitled to declaratory and/or injunctive relief to remedy Defendants' continuing violations of the antitrust laws;

(l) whether Plaintiff and the members of the Class are being irreparably injured by Defendants' continuing violations of the antitrust laws;

(m) whether Graco should be ordered to divest its fast-set equipment line of business;

(n) whether Distributors should be order to sell at least 25% non-Graco fast-set equipment, so long as non-Graco equipment becomes reasonably available; and

(o) whether the conduct of Defendants caused and continues to cause injury to the business and property of Plaintiff.

192. Plaintiff's claims are typical of the claims of the other members of the Class within the meaning of Rule 23(a)(3). Plaintiff and all other members of the Class made purchases of Graco fast-set equipment either directly from Graco or from one of the Distributor conspirators, at artificially maintained, anticompetitive prices established by Graco, through agreements with Distributors and sold by Defendants to the Class. Plaintiff and the other members of the Class have sustained damages arising out of the conduct of the Defendants in violation of law as complained of herein.

193.   Plaintiff will fairly and adequately protect the interests of the members of the Class as required by Rule 23(a)(4) and has retained counsel competent and experienced in class action and antitrust litigation.

194.   As demonstrated above, this action is properly maintained as a class action pursuant to Rule 23(b)(3) in that questions of law and fact common to the claims of Plaintiff and the members of the Class predominate over questions of law or fact affecting only individual members of the Class, such that a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  All of these issues arise from the conduct of Defendants, as complained of herein.

195.   Further, this action is properly maintained as a class action pursuant to Rule 23(b)(2) because Defendants have acted in a manner generally applicable to the Class, by:

(a) conspiring to restrict the distribution of fast-set equipment other than Graco's;

(b) conspiring to maintain artificially high prices, as set by Graco and agreed to by and among the Distributors, for Graco's fast-set equipment; and

(c) conspiring to maintain Graco's market power, thus making the grant of final relief appropriate on a class-wide basis.

196.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  The prosecution of separate actions by individual members of the Class against Defendants would impose heavy burdens upon the courts and the members of the Class.  It would also create the risk of myriad combinations of potential litigation and inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

197.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for many individuals, while substantial, are not great enough to enable them to maintain separate suits against the Defendants, Plaintiff anticipates no difficulty in the management of this action as a class action.

## **FIRST CLAIM FOR RELIEF**

## **Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

## **(Conspiracy to Restrain Trade By Means of Vertical Retail Price-Fixing —**

## **Injunctive Relief and Damages Against All Defendants)**

198.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

199.   From at least as early as 2005, Defendants have entered, each with all of the others, into a vertical retail price-fixing agreement and conspiracy, and have maintained, enforced and policed the agreement and otherwise acted in concert with each other by: (1) fixing, maintaining, and stabilizing the price of FSE; and (2) allocating geographic and customer markets between the Distributors designed to foreclose competing distributors, not part of the conspiracy, from carrying new entrant products and from charging competitive prices, thereby unreasonably restraining trade and causing a substantial lessening of competition in the fast-set equipment market in North America, all in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

200.   As a direct and proximate result of the violations alleged herein, price competition and in the sale of FSE has been restrained, suppressed, or eliminated; prices for SFE sold by Defendants has been fixed, raised, maintained and stabilized at artificially high, anticompetitive levels throughout North America; and the Class

has been unable to, and may continue to be unable to purchase FSE at prices

determined by free and open competition, and the Class has been damaged, and

may continue to be damaged, by their respective purchases of fast-set equipment at

prices higher than they otherwise would have paid, absent Defendants' unlawful

conduct.

201.   As a result of Graco's exclusionary, anticompetitive, and illegal

conduct, the Class paid artificially inflated prices for fast-set equipment.

202.   Plaintiff and members of the Class have been injured in their business

or property by Graco's antitrust violations.  Their injury consists of having paid

higher prices for fast-set equipment than they would have paid in the absence of

the violations.  Such injury, called "overcharges," is of the type antitrust laws were

designed to prevent, flows from that which makes Graco's conduct unlawful, and

the Class consists of proper parties to bring a case concerning this conduct.

203.   Defendants' agreement and conspiracy in restraint of trade violates

Section 1 of the Sherman Act, 15 U.S.C. § 1.

204.   For complete and future relief, Plaintiff and the Class have no

adequate remedy at law for continuing violations of this statute.

## SECOND CLAIM FOR RELIEF

## Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

## (Use of Exclusionary Contracts and Other Conduct — Injunctive Relief and Damages Against All Defendants)

205.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

206.   Graco and the Distributors combined, conspired, and contracted among themselves collectively and separately to eliminate and bar new entrants, such as Gama/PMC from coming into the FSE market.

207.   These actions are in violation of 15 U.S.C. § 1 in that they served to unreasonably restrain trade and to maintain prices for fast-set equipment sold in the North America at supracompetitive levels by foreclosing the sale of products by potential new entrants or new entrants such as Gama/PMC in the North American market.

208.   The Class has been injured in their business or property by reason of Defendants' antitrust violations.  They have been injured by having to pay higher prices for fast-set equipment.  Such injury, called "overcharges," is of the type the antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

209.   For complete and future relief, Plaintiff and the Class have no adequate remedy at law for continuing violations of this statute.

## THIRD CLAIM FOR RELIEF

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

**(Monopolization of the Fast-Set Equipment Market — Injunctive Relief and Damages Against Graco)**

210.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

211.   Fast-set equipment as defined above is a relevant product market, and North America is the relevant geographic market.

212.   Graco possessed, and currently possesses, monopoly power in the FSE market.  Barriers to entry and expansion by existing firms are high in this market.

213.   Graco, with between 90% and 95% market share of the FSE market, has the power to control price and exclude competition in the FSE market.

214.   Graco willfully and wrongfully obtained and/or maintained its monopoly in the FSE market by engaging in the exclusionary, anticompetitive, and illegal as set forth herein.

215.    The anticompetitive effects of Graco's conduct far outweigh any purported nonpretextual, procompetitive justifications, and, in any event, Graco's conduct was not reasonably necessary to achieve the same.

216.    As a direct, foreseeable, and proximate result of Graco's exclusionary, anticompetitive, and illegal conduct, the Class has been harmed and competition has been impaired by, without limitation, depriving the Class of fair and timely access to innovative, more reliable, better quality, and lower priced fast-set equipment, including products made by Gama/PMC and/or products that would have been made by Gama/PMC or other new entrants, which healthy and fair competition would have provided..

217.    As a result of Graco's exclusionary, anticompetitive, and illegal conduct, the Class paid artificially inflated prices for fast-set equipment.

218.    Plaintiff and members of the Class have been injured in their business or property by Graco's antitrust violations.  Their injury consists of having paid higher prices for fast-set equipment than they would have paid in the absence of the violations.  Such injury, called "overcharges," is of the type antitrust laws were designed to prevent, flows from that which makes Graco's conduct unlawful, and the Class are proper parties to bring a case concerning this conduct.

219.    For complete and future relief, Plaintiff and the Class have no adequate remedy at law for continuing violations of this statute.

## FOURTH CLAIM FOR RELIEF

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

### (Attempt and Conspiracy To Monopolize — Against Defendants)

220.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

221.   Distributors attempted to and conspired to acquire, maintain, and enhance Graco's monopoly power in the FSE market.

222.   Defendants specifically intended that their agreements would acquire, maintain, and enhance Graco's monopoly in the FSE market, and injure the Class.

223.   The Distributors benefitted substantially from Graco's continued and enhanced monopoly power because of, inter alia, the substantial rebates, discounts, market share incentives, and geographic control of sales territories they received from Graco in exchange for agreeing to exclude new entrants such as Gama/PMC from the FSE market and protected Graco's monopoly power.

224.   Graco and each Distributor committed at least one overt act in furtherance of their conspiracy.

225.   As a result of this unlawful conspiracy and/or conspiracies to monopolize, the Class has paid and continues to pay artificially inflated prices for fast-set equipment.

226.   The Class has been and continues to be injured in their business or property by Defendants' antitrust violations.  Their injury consists of having paid higher prices for fast-set equipment than they would have paid in the absence of the violations.  Such injury, called "overcharges," is of the type antitrust laws were designed to prevent, flows from that which makes Defendants' conduct unlawful, and the Class consists of proper parties to bring a case concerning this conduct.

227.   The anticompetitive effects of Defendants' conduct far outweigh any purported nonpretextual, procompetitive justifications, and, in any event, Defendants' conduct was not reasonably necessary to achieve the same.

228.   In the alternative, Plaintiff alleges Defendants' conduct constituted multiple separate conspiracies and attempts to monopolize, each in violation of 15 U.S.C. § 2, against each Distributor separately in conspiracy with Graco.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 3 of the Clayton Act, 15 U.S.C., § 14

**(Use of Exclusionary Contracts To Substantially Lessen Competition —**

**Injunctive Relief and Damages Against All Defendants)**

229.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

230.   Graco and the Distributors entered into contracts for the purchase of goods (Graco fast-set equipment) that, by their agreed-upon terms, duration, and

cumulative practical effect, prevented the Distributors from purchasing fast-set equipment from any potential competitor or actual competitor of Graco, including Gama/PMC.

231.   The Distributors purchased fast-set equipment from Graco, consistent with their respective exclusionary contracts with Graco, which excluded potential competitors and actual competitors from 95% or more of the sales opportunities for fast-set equipment and substantially lessened competition or created a Graco monopoly in the FSE market in North America.

232.   The anticompetitive effects of Defendants' conduct far outweigh any purported nonpretextual, procompetitive justifications, and, in any event, Defendants' conduct was not reasonably necessary to achieve the same.

233.   As a direct, foreseeable, and proximate result, Defendants have harmed the Class, and competition by, without limitation, depriving the Class of fair and timely access to innovative, more reliable, better quality, and lower priced fast-set equipment, including products made by Gama/PMC and/or products that would have been made by Gama/PMC or other new entrants, which healthy and fair competition would have provided.

234.   As a result of Graco's exclusionary, anticompetitive, and illegal conduct, the Class paid artificially inflated prices for fast-set equipment.

235.   Plaintiff and members of the Class have been injured in their business or property by Graco's antitrust violations.  Their injury consists of having paid higher prices for fast-set equipment than they would have paid in the absence of the violations.  Such injury, called "overcharges," is of the type antitrust laws were designed to prevent, flows from that which makes Graco's conduct unlawful, and the Class consists of proper parties to bring a case concerning this conduct.

236.   In the alternative, Plaintiff alleges Graco's agreement with each Distributor was as an exclusionary contract to substantially lessen trade, each of which created an independent violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, against Graco and each of the Distributors separately.

237.   For complete and future relief, Plaintiff and the Class have no adequate remedy at law for continuing violations of this statute.

## SIXTH CLAIM FOR RELIEF

### Violations of Section 7 of the Clayton Act, 15 U.S.C. § 18

### (Unlawful Acquisitions — Injunctive Relief, including Divestiture Against Graco)

238.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

239.   Graco's acquisitions of Gusmer and GlasCraft substantially lessened competition and created a monopoly in the FSE market in violation of Section 7 of

the Clayton Act, as amended, 15 U.S.C. § 18 at the same time maintaining Graco's

ability to charge anticompetitive prices, thus, extracting monopoly profits and

transferring wealth from Contractors to itself.

240.   The unlawful acquisitions have, among other things:

(a) Eliminated actual, direct, and substantial competition among Graco,

Gusmer, and GlasCraft in the FSE market;

(b) Permitted Graco to increase prices, reduce product options and

offerings, and reduce innovation;

(c) Permitted Graco to increase barriers to entry and expansion by

foreclosing access to established fast-set equipment distributors;

(d) Substantially increased the level of concentration in the relevant

market; and

(e) Allowed Graco to exercise market power unilaterally in the relevant

market.

241.   The loss of competition from Gusmer and GlasCraft has given Graco

the ability to raise barriers to entry and exclude prospective competitors from the

North American fast-set equipment market.  Graco became the sole supplier for the

only significant fast-set equipment distribution channel in North America and the

only authorized source of spare parts for its existing installed base.  Consequently,

Graco has been able to prevent its distributors from withdrawing from the

conspiracy to exclude new entrants and prevented them from carrying the products of competing manufacturers.

242.   The significant anticompetitive effects of Graco's acquisitions are not offset by any efficiencies realized by the acquisitions.

243.   For complete and future relief, Plaintiff and the Class have no adequate remedy at law for continuing violations of this statute.

## SEVENTH CLAIM FOR RELIEF

## Violation of Violation of State Antitrust and Unfair Competition Laws

## (Against All Defendants)

244.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

245.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401 *et seq.*

246.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§ 16700 *et seq.* and Cal. Bus. & Prof. Code §§ 17200 *et seq.*

247.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4503 *et seq.*

248.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Code, H.R.S. §§ 480-1, *et seq.*

249.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 *et seq.*

250.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*

251.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*

252.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.773 *et seq.*

253.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.52 *et seq.*

254.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1 *et seq.*

255.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

256.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

257.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

258.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New York Gen. Bus. Law § 340 *et seq.*

259.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. § 75-1 *et seq.*

260.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

261.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the Puerto Rico Code 10 LPRA § 251, *et seq.* and 31 LPRA § 5141.

262.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

263.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*

264.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.*

265.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Stat. §§ 76-10-919 *et seq.*

266.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1 *et seq.*

267.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*

268.   Class Members in each of the states listed above paid supracompetitive, artificially inflated prices for SFE. As a direct and proximate result of Defendants' unlawful conduct, such members of the Class have been injured in their business and property in that they paid more for SFE than they otherwise would have paid in the absence of Defendants' unlawful conduct.

269.   As a result of Defendants' violations of the statutes set forth, Class members seek damages and costs of suit, including reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### Violation of State Consumer Protection and Unfair Competition Laws

### (Against All Defendants)

270.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

271.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

272.   Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Arkansas Code § 4-88-101 *et seq.*

273.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Bus. & Prof. Code § 17200 *et seq.*

274.   Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901 *et seq.*

275.   Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*

276.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kansas Stat. § 50-623 *et seq.*

277.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices that were indirectly purchased primarily for personal, family, or household purposes in violation of 5 Maine Rev. Stat. § 207 *et seq.*

278.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts General Laws, Chapter 93A, § 1 *et seq.*

279.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana Code § 30-14-201 *et seq.*

280.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Rev. Stat. § 59-1601 *et seq.*

281.    Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq*.

282.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen. Bus. Law § 349 *et seq*. Specifically:

(a) Defendants engaged in commerce in New York;

(b) Defendants and their co-conspirators secretly agreed to raise prices by direct agreement on bids to customers located in New York and through artificial supply restraints on the entire FSE market;

(c) New York consumers were targets of the conspiracy;

(d) The secret agreements were not known to New York consumers;

(e) Defendants made public statements about the price of FSE that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for FSE and products containing FSE; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information;

(f) Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on New York consumer class members who purchased FSE for end use and not for resale; and the class members have been injured because they have paid more for FSE than they would have paid in the absence of Defendants' unlawful trade acts and practices

(g) Because of Defendants' unlawful trade practices in the State of New York, New York class members who purchased FSE were misled to believe that they were paying a fair price for FSE or the price increases for FSE were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct;

(h) Defendants knew that their unlawful trade practices with respect to pricing FSE would have an impact on New York consumers;

(i) Defendants knew that their unlawful trade practices with respect to pricing FSE would have a broad impact, causing class members who purchased FSE to be injured by paying more for FSE than they would have paid in the absence of Defendants' unlawful trade acts and practices; and

(j) Defendants' consumer-oriented violations adversely affected the public interest in the State of New York.

283.   Defendants have engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff for itself and on behalf of the Class requests entry of judgment as follows:

(a)   A declaration that Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1

(b)   A declaration that Defendants' conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

(c)   A declaration that Defendants' conduct violated Section 3, 4, 7 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15,18 and 26.

(d)   A declaration that the Defendants violated the various state laws alleged herein.

(e)   Certifying that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel, Nossaman and Duane Morris, as co-lead Class counsel;

(f)   Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

(g)     Awarding Plaintiff and the Class their full monetary damages to be proven at trial;

(h)     Awarding Plaintiff and the Class treble their monetary damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(i)     Awarding Plaintiff and the Class pre- and post-judgment interest on their damages;

(j)     Awarding Plaintiff and the Class the costs of this action and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 15;

(k)     Entering a permanent injunction to preclude future violations of law, including an order prohibiting Graco and Distributors from continuing to exclusively deal with one another, an order requiring Distributors to sell 25% non-Graco fast-set equipment, so long as non-Graco equipment becomes reasonably available, and an order divesting Graco of its fast-set equipment business; and

(l)     Awarding Plaintiff and the Class such other and further relief as the Court deems just and proper.

Dated: June 14, 2013               NOSSAMAN LLP

                               By:  <u>s/ Christopher Nedeau</u>
                                    Christopher A. Nedeau (CA81297)
                                    (*Pro Hac Vice pending*)
                                    50 California Street
                                    San Francisco, CA  94111
                                    Telephone: (415) 398-3600
                                    Facsimile: (415) 398-2438
                                    [CNedeau@nossaman.com](mailto:CNedeau@nossaman.com)

                               DUANE MORRIS LLP

                               By: <u>s/ Lawrence H. Pockers</u>
                                    Lawrence H. Pockers (PA84589)
                                    30 South 17th Street
                                    Philadelphia, PA 19103
                                    Telephone:  (215) 979-1153
                                    Facsimile:  (215) 689-3761
                                    [LHPockers@duanemorris.com](mailto:LHPockers@duanemorris.com)

                               Counsel for Plaintiff
                               INSULATE SB, INC.

<u>ATTESTATION OF FILER</u>

Pursuant to Standing Order No. 05-6, filing counsel hereby attests that

concurrence in the filing of this document has been obtained from each of the other

signatories.


Dated: June 14, 2013                DUANE MORRIS LLP



                                    By: <u>s/ Lawrence H. Pockers</u>
                                        Lawrence H. Pockers

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on its own behalf and on behalf of the Class, demand a trial by jury of all claims asserted in this Complaint so triable.

Dated: June 14, 2013                    NOSSAMAN LLP

By: s/ Christopher A. Nedeau
     Christopher A. Nedeau (CA81297)
     (*Pro Hac Vice pending*)
     50 California Street
     San Francisco, CA  94111
     Telephone: (415) 398-3600
     Facsimile: (415) 398-2438
     CNedeau@nossaman.com

DUANE MORRIS LLP

By: s/ Lawrence H. Pockers
     Lawrence H. Pockers (PA84589)
     30 South 17th Street
     Philadelphia, PA 19103
     Telephone:  (215) 979-1153
     Facsimile:  (215) 689-3761
     LHPockers@duanemorris.com

Counsel for Plaintiff
INSULATE SB, INC.