# Exhibit "G"

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GRACO, INC., et al., ) | Case No. 08-CV-01304 (PGS)(DEA) |
| ) | |
| Plaintiffs, ) | ***Document electronically filed*** |
| v. ) | |
| PMC GLOBAL, INC., et al., ) | |
| ) | **Oral Argument Requested** |
| Defendants. ) | |
| ) | **[Public, Redacted Version]** |
| DENIS S. COMMETTE, GAMA ) | |
| MACHINERY USA, INC., AND GARRAF ) | |
| MAQUINARIA, S.A., ) | |
| ) | |
| Counterclaim Plaintiffs, ) | |
| v. ) | |
| ) | |
| GRACO, INC. and GRACO MINNESOTA ) | |
| INC., ) | |
| ) | |
| Counterclaim Defendants. ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Michael R. Griffinger, Esq.
Guy V. Amoresano, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

David S. Bloch, Esq. *(pro hac vice)*
Patrick M. Ryan, Esq. *(pro hac vice)*
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, California 94111
(415) 591-1000

Attorneys for Defendants PMC Global, Inc., PMC, Inc., PMC Europe Investments, S.L., Denis S. Commette, and Gama Machinery USA, Inc.

## TABLE OF CONTENTS

**Page**

LEGEND OF ABBREVIATIONS ............................................................................. iii

TABLE OF AUTHORITIES ...................................................................................iv

INTRODUCTION...................................................................................................1

STATEMENT OF FACTS ......................................................................................2

      A.     Spray Foam Equipment...............................................................2

      B.     The Sales Channel For Spray Foam Equipment .........................3

      C.     Graco Acquires its Competitors to Become a Monopolist ..........4

      D.     Graco Acts to Restrict New Entry into the Market......................5

ARGUMENT ..........................................................................................................9

   I.     GRACO HAS UNLAWFULLY MAINTAINED A
        MONOPOLY IN VIOLATION OF SECTION 2 OF THE
        SHERMAN ACT........................................................................9

      A.     The Market's Structure Reveals Graco's Monopoly Power........9

          1.    Substantial Evidence Supports Gama's Market
               Definition ......................................................................10

               a.     The Products Graco Argues Should Be
                    Included In The Market Are Not Functionally
                    Interchangeable With SFE....................................11

                   (1)   Fiberglass and Other Insulation ..................11

                   (2)   RIM (IPPE) Equipment...............................12

                   (3)   Self-Contained, Compact Spray-Foam
                          Products........................................................12

                b.     The Data Show That Cross-Elasticity Of
                    Demand Is Absent Between SFE And Other
                    Products .................................................................14

                c.     Graco's Own Documents Demonstrate
                    Graco's Recognition Of A Separate Market
                    For Spray Foam Equipment ..................................16

# TABLE OF CONTENTS
(continued)

Page

      d.    Graco's Expert Defines No Alternative Market ..................................................................18

    2.    The Evidence Supports Gama's Contention That The Relevant Market Is Limited To North American Suppliers ........................................................18

    3.    Graco Commands a Market Share in Excess of 90 Percent................................................................19

    4.    Graco Has Erected A High Barrier To Entry Into The Market ...................................................21

  B.    Alternatively, There is Direct Evidence of Graco's Monopoly Power, Making Circumstantial Proof Via Market Structure Unnecessary ....................................25

  C.    Graco Has Abused Its Monopoly Power ...................................27

  D.    Gama Has Sufficient Evidence Of Harm To Itself And To Competition.......................................................................31

II.    GRACO HAS UNLAWFULLY ATTEMPTED TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT.......................................................................34

III.    GAMA HAS STANDING TO PURSUE CLAIMS FOR THE ENTIRE PERIOD OF GRACO'S ANTITRUST VIOLATION .........34

IV.    GAMA HAS SUFFICIENT EVIDENCE TO SUPPORT THE STATE LAW COUNTERCLAIMS AGAINST GRACO...................37

  A.    Graco's Conduct Constitutes Trade Libel...................................37

  B.    Graco Engaged in Unfair Competition ......................................38

  C.    Graco Interfered With Gama's Prospective Economic Advantage......................................................................39

CONCLUSION ........................................................................40

APPENDIX (Table of Names/Employers)…………………………………….A1-A3

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Acme Mkts. v. Wharton Hardware & Supply Corp.,
890 F. Supp 1230 (D.N.J. 1995) ............................................................................. 34

Am. Tobacco Co. v. United States,
328 U.S. 781 (1946) ............................................................................................... 20

Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters,
459 U.S. 519 (1983) ............................................................................................... 35

Barr Labs v. Abbott Labs,
978 F.3d 98 (3d Cir. 1992) ............................................................................... 15, 26

Bracco Diagnostics, Inc. v. Amersham Health, Inc.,
627 F. Supp. 2d 384 (D.N.J. 2009) ......................................................................... 39

Broadcom Corp. v. Qualcomm Inc.,
531 F.3d 297 (2007) ................................................................................................. 9

Brown Shoe Co. v. United States,
370 U.S. 294 (1962) ............................................................................................... 16

Carpet Group Int'l v. Oriental Rug Importers Ass'n,
227 F.3d 62 (3d Cir. 2000) ..................................................................................... 35

Duffy v. Charles Schwab & Co., Inc.,
123 F. Supp. 2d 802 (D.N.J. 2000) ......................................................................... 38

Dupont v. Kolon Indus.,
637 F.3d. 435 (7th Cir. 2011) ................................................................................. 19

Eastman Kodak Co. v. Image Technical Servs, Inc.,
504 U.S. 451 (1992) ............................................................................................... 20

Fed. Labs v. Barringer Research,
696 F.2d 271 (3d Cir. 1982) ................................................................................... 16

Hayden Pub. Co. v. Cox Broad.,
730 F.2d 64 (2d Cir. 1984) ..................................................................................... 10

Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.,
   282 N.J. Super. 140 (App. Div. 1995)..................................................... 40

In re Lower Lake Erie Iron Ore Antitrust Litig.,
   998 F.2d 114 (3d Cir. 1993) ................................................................. 35

Lamorte Burns & Co. v. Walters,
   167 N.J. 285 (2001) ............................................................................ 40

LePage's v. 3M,
   324 F.3d 141 (3d Cir. 2003) ..................................................... 27, 31, 33

Lorain Journal Co. v. United States,
   342 U.S. 143 (1951) ..................................................................... 27, 30

Mayflower Transit, L.L.C. v. Prince,
   314 F. Supp. 2d 362 (D.N.J. 2004)........................................................ 37

Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,
   129 S. Ct. 1109 (2009).......................................................................... 30

Patel v. Soriano,
   369 N.J. Super. 192 (App. Div. 2004)............................................... 37, 38

Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania,
   745 F.2d 248 (3d Cir. 1984) ........................................................... 18, 20

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
   124 F.3d 430 (3d Cir. 1997) ................................................................. 10

Rebel Oil Co. v. Atl. Richfield Co.,
   51 F.3d 1421 (9th Cir. 1995) ................................................................. 21

Ryan v. Carmona Bolen Home for Funerals,
   341 N.J. Super. 87 (App. Div. 2001)............................................ 38, 39, 40

Spectrum Sports, Inc. v. McQuillan,
   506. U.S. 447 ........................................................................................ 34

Tampa Electric Co. v. Nashville Coal Co.,
   365 U.S. 320 (1961) ............................................................................. 18

United States v. Aluminum Co. of Am.,
   148 F.2d 416 (2d Cir. 1945) ................................................................. 20

United States v. Container Corp. of Am.,
   393 U.S. 333 (1969) .......................................................................... 15

United States v. Dentsply Int'l, Inc.,
   399 F.3d 181 (3d Cir. 2005) ........................................................... passim

United States v. E.I. du Pont de Nemours & Co.,
   351 U.S. 377 (1956) ..................................................................... 10, 20

United States v. Grinnell Corp.,
   384 U.S. 563 (1966) .......................................................................... 20

United States v. Microsoft,
   253 F.3d 34 (D.C. Cir 2001).............................................................. 33

Varrallo v. Hammond Inc.,
   94 F.3d 842 (3d Cir. 1996) ................................................................. 39

Verizon Commc'ns, Inc. v. Law Offices of Trinko,
   540 U.S. 398 (2004) .......................................................................... 30

Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,
   210 F. Supp. 2d 552 (D.N.J. 2002)...................................................... 38

**Statutes**

15 U.S.C. § 1125 ................................................................................ 38

New Jersey Fair Trade Act,
   N.J.S.A. 56:4-1 ............................................................................... 38

Sherman Act,
   15 U.S.C. § 2................................................................................ 1, 9, 39

**Other Authorities**

Herbert Hovenkamp,
   Federal Antitrust Policy § 3.6 (West 2005).......................................... 18

## INTRODUCTION

Plaintiff/Counterclaim Defendant Graco, Inc. ("Graco") manufactures, among other things, equipment used by contractors primarily for the installation of foam insulation in residential and commercial buildings (as further defined infra, "Spray Foam Equipment" or "SFE"). By acquisition of its largest competitors in 2005 and 2008, Graco grew its market share to 95%. Graco has now acted to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by threatening key SFE distributors, who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that if they carry any new competitive equipment, Graco will cut them off. Counterclaimant Gama USA, Inc. ("Gama")[1] has had its market access restrained by this boycott. As a result, Gama has asserted claims against Graco for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Graco's conduct is also the subject of an investigation by the Federal Trade Commission. ECF No. 639. This Brief is submitted in opposition to Graco's motion seeking summary judgment dismissing those claims, as well as certain related state law claims made by Gama. In summary, this Brief will argue:

(1) Gama has significant evidence of Graco's monopoly power under both the circumstantial/structural method of proving such power (**Point I.A.** herein), as well as under the alternative, direct evidence approach (**Point I.B.** herein);

(2) As to the structural mode of proof, Graco's arguments concerning the relevant market (Graco Brief, Point II.A) are flawed. The products Graco identifies, including fiberglass insulation, are not functionally interchangeable with SFE (**Point I.A.1.a.** herein). Additionally, expert analysis of Graco's aggressive price increases and gross margins demonstrates that SFE prices are not affected by the presence of alleged substitute products. (**Point I.A.1.b**. herein). Finally, contrary to Graco's assertions (Graco Brief, Point II.A.2.), manufacturers outside North America

---

[1] During this litigation, Gama changed its name to Polyurethane Machinery Corp. The parties have continued to call the company "Gama" during this litigation.

without a distribution presence here are not suppliers to whom North American buyers "can practically turn" for supply. (**Point I.A.2** herein);

(3) Under the structural mode of proof, Graco's monopoly power is established by Graco's 90+% market share, which is comfortably above the thresholds established by the relevant caselaw (**Point I.A.3**. herein), and that market share is protected by the barrier to entry Graco has erected in the form of its distribution channel boycott. (**Point I.A.4** herein);

(4) Alternatively, under the direct evidence mode of proof, which does <u>not</u> require defining a relevant market or assessing market share or entry barriers, Gama's experts' analysis of price and gross margins, together with the evidence of Graco's actual use of the channel barrier to exclude market entry, demonstrates Graco's actual ability to control price or exclude competition. (**Point I.B** herein);

(5) Graco has used predatory conduct, in the form of its closure of the distribution channel, to unlawfully maintain its monopoly (**Point I.C** herein), and has thereby reduced competition and injured Gama. (**Point I.D** herein). The same facts support Gama's attempted monopolization claim as well. (**Point II** herein). Gama has standing to recover for the harm done to it, including during the time when it acted as the North American master distributor for an overseas manufacturer. (**Point III** herein); and

(6) Gama has produced sufficient evidence in support of each element of its state law claims. (**Point IV** herein).

## STATEMENT OF FACTS

### A. Spray Foam Equipment

Gama's counterclaims accuse Graco of monopolizing the market for the sale of spray foam equipment, which is machinery used to make and apply spray polyurethane foam. Spray polyurethane foam is a compound created when two

chemicals, "isocyanates" and "polyols," mix.  See Supplemental Statement of Undisputed Facts ("SSUF") 5; Declaration of Denis Commette[2] ("D.C. Dec.") ¶ 5. When correctly blended, the chemical reaction creates a polyurethane foam that "sets up" very quickly.  D.C. Dec. ¶ 5.  Such foam often is called "fast-set" foam, and the spray equipment used to create and apply it often is called "fast-set equipment."  Id.  The predominant use of spray polyurethane foam is as insulation. Id. ¶ 6; SSUF 4.  While much more expensive than fiberglass or cellulose insulation to purchase, spray polyurethane foam also has much greater insulating power.  Id.; Declaration of Kevin Weber ("W.D."), Ex. 164 (Hrynkiewicz Dep. at 166:17-20).[3]

The application of spray polyurethane foam by contractors requires special equipment ("Spray Foam Equipment" or "SFE" as further defined infra).  D.C. Dec. ¶ 8; SSUF 7-10.  The chemical components must be kept separate until the moment of application (because they set so quickly when mixed), kept heated, and mixed in correct proportions.  The equipment needs to be portable and capable of delivering the chemicals to the spray gun, where the mixing occurs, under high pressure and at the proper temperature, even though the spraying may happen at a considerable distance from where the chemicals and "proportioner" are located.  Id.; W.D. Ex. 1 (Baumgartner Dep., 31:12-17) and 2 (at 25-26).  The typical components of SFE are pictured and explained in more detail in the D.C. Dec., ¶¶ 8-17.

**B.** **The Sales Channel For Spray Foam Equipment**

The overwhelming percentage of SFE sales occur through a number of well-established independent distributors, not directly between manufacturers and contractors.  Declaration of William Hrynkiewicz ("Hry. Dec.") ¶¶ 14-15; SSUF 11-12.  Contractors patronize these distributors for the sales and service of the

---

[2] An Appendix identifying relevant witnesses is attached at the back of this Brief.
[3] Some fast-set spray polyurea products can also be used to coat or weatherproof structures, like the interior of an industrial boiler.  SSUF 6.

equipment, training, replacement parts, and, in many cases, the necessary chemicals to produce the foam.[4]  These distributors, who historically carried multiple manufacturer's brands, have the close customer relationships with the contractors who buy SFE, and no SFE supplier can achieve a meaningful market share if it cannot sell through the incumbent distributor base.[5]

**C.  Graco Acquires its Competitors to Become a Monopolist.**

For years, Gusmer Corp. ("Gusmer") was the industry leader in SFE.  D.C. Dcc. ¶¶ 1-2, 18; W.D. Ex. 2 (at 22); SSUF 14.

In 2005, Graco purchased Gusmer from PMC Global, Inc. ("PMC").  SSUF 15.  The purchase agreement contained no non-compete clause, thus leaving PMC free to re-enter the market and compete against Graco at any time.  See ECF No. 81 at 28 (Wolfson, U.S.D.J.).

W.D. Ex. 14 (at 136).  In February 2008,

Graco acquired GlasCraft.

W.D. Ex. 19; SSUF 19-

---

[4] W.D. Ex. 3 (Benthien Dep., 83:21-85:7) and 167 (Commette Dep. 216:21-218:20); Hry. Dec. ¶¶ 14, 17.

[5] W.D. Ex. 4 (Tate Dep., 104:24-105:14), 5, 6, 7 (Sebion Dep., 356:18-22), 8 (Donaghy Dep., 21:25-23:3), 9 (Tolbert Dep., 57:5-12), 10 (DeMita Dep., 80:25-81:7); Hry. Dec. ¶¶ 16, 17, 33-34.  See infra, Point I.A.4.

[6] Compare W.D. Ex. 11 (at 136) (65%) with Ex. 12 (mid 80's).  SSUF 16, 18.

[7]

20. While preparing to buy GlasCraft, Graco surveyed SFE distributors to gauge their reaction to Graco's elimination of GlasCraft. Many were alarmed:



**D.    Graco Acts to Restrict New Entry into the Market.**

Before Graco's acquisition of Gusmer, SFE manufactured by Gusmer and by Graco reflected different design philosophies. D.C. Dec. ¶ 19. Gusmer's flagship model, the "II20/35," had long been the industry standard. Id. ¶ 18; SSUF 47. Its design, with a "low tech" control panel and accessible mechanical parts, made the Gusmer product repairable in the field. Id. Graco, on the other hand, took a more "high tech" approach, with sophisticated printed circuit controls and less accessible mechanical parts. Id. The trade-off was a machine that was harder to repair in the field. Id. When Graco acquired Gusmer, it obsoleted the Gusmer line of products. ▮▮▮▮▮▮▮▮▮▮ Hry. Dec. ¶ 3. This channeled buyers to the generally more expensive corresponding Graco models. ▮▮▮▮

Graco also fired many former Gusmer employees, both in New Jersey and at Gusmer's European affiliate in Spain.[8] In August 2006, some of the fired Spanish employees launched a Spanish company named Garraf Maquinaria, S.A. ("Garraf")

_____

[8] ECF No. 234, ¶ 34; W.D. Ex. 159; (Galdonik Dep. 179:7); Ex. 160 (Doug Commette Dep. 112:22-113:2).

to attempt to exploit the opportunity created by Graco's product strategy.[9]  PMC decided to support the efforts of its fired former employees, and launched Gama as a New Jersey company in September 2007, to act as master distributor of Garraf SFE in the North American market.  W.D. Ex. 24; SSUF 2, 3.  That relationship between Garraf and Gama eventually ended, and Gama now sells equipment of its own design and manufacture that it launched in approximately October 2009.[10]



Graco saw the threat.

---

[9] ECF No. 216, ¶ 7; W.D. Ex. 168 (G. Kamins Dep. 94:7-95:2).

[10] W.D. Ex. 25 (Commette 12/2009 Dep. 25:18-26:6); 26 (Scher Dep. 109:18-111:7); 27 (Daugherty Dep. 30:8-12, 269:13-270:22, 272:10-24); Hry. Dec. ¶ 11.



On October 24, 2007, Graco dispatched a letter (the "Boycott Letter") to North American SFE distributors, purporting to use the "best efforts" clause in their distributorship agreements to threaten retaliation against any distributor that agreed to carry a new, competitive line:

> **Should a distributor add a competitive product line, it will result in an immediate review of our business relationship and may impact access to specific products, changes in addendum status or possible elimination of our distributor agreement.** W.D. Ex. 44.



Graco's enforcement of its boycott is exemplified by the events surrounding one of the largest SFE distributors, New Jersey-based Foampak, Inc., and its President, Chris Donaghy. Prior to the Boycott Letter, Gama was having success pursuing Foampak as a distributor for its new line of Garraf SFE. W.D. Ex. 8 (Donaghy Dep. 74:11-19). Despite the Boycott Letter, Graco learned in January 2009 that Foampak was still preparing to take on the Gama product line. Id. (82:14-83:5). Graco quickly flew two executives across the country to meet with Chris Donaghy at a local Holiday Inn, where they delivered an ultimatum:

> **[I]f you do take on the Gama line, you will immediately lose your . . . discounts and then receive a letter notifying you of 60-day termination of your Graco distributorship . . . . There will be NO combined Graco and Gama distributorships, EVER . . . .** W.D. Ex. 47 (emphasis in original);

Foampak was left with no choice but to acquiesce. W.D. Ex. 8 (Donaghy Dep. 77:16-25; 89:17-92:9); Hry. Dec. ¶ 29. Graco bragged:



Graco promptly made sure that its other large distributors knew about how it had handled Foampak. ███████ (DeMita Dep. 24:23-25:16). The Graco-imposed boycott has been successful, ████████, and persistent. ██████

[REDACTED] Garraf, for its part, advised the Court in September 2009 that it was no longer able to sustain itself against Graco's assault and defaulted in this litigation. ECF Nos. 177, 178, 219. Gama transitioned to manufacturing its own SFE. Hry. Dec. ¶ 11. Mr. McHale has gotten his way [REDACTED] Gama's expert has opined that but for Graco's predatory behavior, Gama could have been expected to carve out a reasonable market share, and that Graco has cost Gama lost profits of at least $6 million and as much as $24 million (prior to trebling), while reaping substantial monopoly profits for itself. Declaration of Greg Regan ("Regan Dec."), Ex. A (at 91-92). Gama's antitrust and other counterclaims herein are brought to redress that harm and to obtain an injunction against Graco's ongoing, unlawful monopolization.

## ARGUMENT

### I. GRACO HAS UNLAWFULLY MAINTAINED A MONOPOLY IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT.

Section 2 of the Sherman Act, 15 U.S.C § 2, makes it unlawful to monopolize any part of interstate trade or commerce within the United States. The elements of monopolization are (1) the possession of monopoly power, and (2) maintenance of that power as distinguished from growth or development as a consequence of a superior product, business product or historic accident. United States v. Dentsply Int'l, Inc., 399 F.3d 181, 186 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006).

### A. The Market's Structure Reveals Graco's Monopoly Power.

Monopoly power is the ability to control price or exclude competition. Dentsply, 399 F.3d at 187. "If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." Broadcom Corp. v. Qualcomm Inc., 531 F.3d 297, 307 (2007). Because direct evidence of monopoly power is not often available, it is most often proved

circumstantially, by inferring monopoly power from the market structure. <u>Dentsply</u>, 399 F.3d at 187. Monopoly power is thus typically inferred from a dominant share of a relevant market and the presence of barriers to entry. <u>Id.</u>

  **1. Substantial Evidence Supports Gama's Market Definition.**

  When defining the relevant market, "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." <u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 395 (1956). The threshold inquiry in determining whether products are in the same relevant market is thus whether "one product is roughly equivalent to another for the use to which it is put." <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 437 (3d Cir. 1997). This is referred to as "functional interchangeability." <u>E.g.</u>, <u>Hayden Pub. Co. v. Cox Broad.</u>, 730 F.2d 64, 70-71 (2d Cir. 1984). If products are functionally interchangeable, then the next question is whether buyers will substitute freely between them, such that a price increase for one of the products will cause an appreciable demand shift to the other. That is, is there "cross-elasticity of demand?" <u>Queen City Pizza</u>, 124 F.3d at 437-38.

  As Graco states, this is a two-step inquiry, with examination of cross-elasticity only necessary if it is first determined that the products are functionally equivalent: "Thus, **where products are functionally interchangeable**, the claimant must prove the boundaries of the market by analysis of cross-elasticity of demand or equivalent proof that the products are not practical substitutes." Graco Brief, at 19 (emphasis added); <u>see</u> <u>also</u> <u>Hayden</u>, 730 F.2d at 71 ("Having found one or more products functionally interchangeable with [the product] in a particular use, the next question to be resolved is one of purchaser reaction -- the willingness or readiness to substitute one for the other."). Gama's experts have opined that a relevant market exists for the sale in North America of SFE, described as high-pressure, two-

- 10 -

component equipment contractors use to apply fast-set spray polyurethane foam, polyurea coatings, and certain epoxies.  Regan Dec. Ex. B (at ¶¶ 4, 7-8, 15-19) and A (at 7, 10-18, 26-40).  Based upon the available data and record evidence, Gama's economist concluded: "For use by contactors there is no reasonable substitute for Spray Foam Equipment because of its highly specialized nature . . . .  To the extent contractors want to offer fast setting spray foam, polyurea coatings, or certain epoxies, they must have [SFE]."  Regan Dec. Ex. B (at ¶ 16).

     **a.    The Products Graco Argues Should Be Included In The Market Are Not Functionally Interchangeable With SFE.**

     **(1)    Fiberglass and Other Insulation**

Although Graco's Brief mentions several products it posits are competitive with SFE, the product market section of its Brief (Graco Brief, at 18-21) argues only one for inclusion in the relevant market: fiberglass and cellulose insulation products. It seems unnecessary to say that Spray Foam *Equipment* is not functionally equivalent to *insulation*.  One is machinery that *creates* and *installs* a particular type of insulation, while the other is insulation itself.  The end user of insulation is the home or building owner.  The end user of SFE is the contractor.  W.D. Ex. 8 (Donaghy Dep. 106:7-9); SSUF 28, 33-34.  One cannot put SFE in one's attic and thereby keep out the cold; and one cannot haul fiberglass insulation up to a roof and use it to spray polyurethane foam.  Spray polyurethane foam *insulation* likely does compete with other forms of *insulation*, but that hardly places the *equipment* that creates spray polyurethane foam in the same product market with the insulation itself.  Hry. Dec. ¶ 13; W.D. Ex. 164 (Hrynkiewicz Dep. 32-34).  Gama's economist offered the following useful analogy:

> **Consider the example of a commercial pizza oven.  Surely, at some level pizza competes with hamburgers, but that does not mean that sellers of ground beef are in competition with sellers of pizza ovens. If the price of all commercial pizza ovens rises because one seller**

**monopolizes the sale of such ovens, it is no solace to pizzeria owners that hamburger meat is cheap.** Regan Dec. Ex. B (at ¶ 17).

In support of its attempt to cram *insulation* products into a relevant *equipment market*, Graco cites predominantly to testimony discussing competition between the foam *insulation* itself and other insulating products, Graco SUF 13, and also excerpts one sentence of a long interrogatory answer. Graco Brief at 4; Graco SOF at 13. The remainder of that interrogatory answer makes clear that its intended meaning is that the end forms of insulation are in competition: "That is, in residential markets, Spray Foam *insulation* competes with fiberglass and cellulose *insulation*. But consumers of fiberglass and cellulose are not consumers of Spray Foam equipment. **And neither fiberglass nor cellulose is a substitute for Spray Foam Equipment**." Graco Ex. VVV, at 23 (Supplemental Response No. 9).

### (2) RIM (IPPE) Equipment

Reaction injection molding ("RIM") equipment is used to pour slow-setting polyurethane foam into a mold to create a variety of types of products in a factory setting. It is also called In-plant Polyurethane Processing Equipment ("IPPE"). RIM equipment is typically far larger, more expensive, and more sophisticated than SFE. It is used in factories to make everything from Nerf footballs to mattresses. Unlike SFE, RIM equipment is used at a fixed manufacturing location, not portable. It is not functionally interchangeable for the same use as SFE. D.C. Dec. ¶ 22; W.D. Ex. 1 (Baumgartner Dep., 36:14-20); 55 (Pagano Dep., 24:21-25:4, 26:14-27:8, 39:5-20), 56 (Nick Dep., 67:10-17); and 57 (at 64); SSUF 27, 32, 48.

### (3) Self-Contained, Compact Spray-Foam Products

There is a group of products that spray fast-setting polyurethane foam, but which do not substitute for the type of high-pressure, contractor-grade SFE defined above and sold by the parties to this case. SSUF 29-31, 49. An example of this type of product is the "Froth-Pak." These are compact products, very different from the SFE at issue in this case: (1) Froth-Pak is more suitable for the do-it-yourselfer than

for high volume contractor jobs. If purchased by contractors[11] at all, the purchase would be in addition to, not instead of, SFE; (2) the cost to use Froth-Pak is much higher, making it economically infeasible for large installations; (3) because Froth-Pak is low pressure and lacks heated hoses, it cannot be used for jobs where the tanks must be located remotely from the spray gun;[12] and (4) unlike professional SFE, the output from a Froth-Pak is not customizable. These differences are explained in the Declaration of Denis Commette (which also shows a Froth-Pak photo), at ¶¶ 24-25, and render Froth-Pak a poor substitute for the equipment sold by Graco and Gama. Other "low pressure" products mentioned by Graco (see Graco SUF at 17) are also not substitutes for SFE. Hry. Dec. ¶ 7.[13]

### b. The Data Show That Cross-Elasticity Of Demand Is Absent Between SFE And Other Products.

Because the products Graco claims are in the relevant market are not functionally interchangeable with SFE, Gama's market definition is supported

---

[11] ████████████████████████████████████████████████████████

[12] SFE heated hoses are often several hundred feet long. See W.D. Ex. 2 (at 26).

[13] Graco states, "Gama's antitrust expert, Greg Regan, admitted that this equipment" is "in the same product market." Graco Brief at 4-5. Graco takes one piece of the record out of context. Gama's antitrust economist, Dr. Kamien, defined a relevant market for the sale of "**high-pressure**, two-component equipment contractors use to apply fast-set spray polyurethane foam, polyurea coatings, and certain epoxies." Regan Dec. Ex. B (at ¶ 4). Froth-Pak is low pressure, which, together with the absence of heated hoses, makes it unsuitable for the type of work performed by SFE. Hry. Dec. ¶ 7; D.C. Dec. ¶ 24-25; see also W.D. Ex. 8 (Donaghy Dep. 11:8-23) Mr. Regan's testimony to which Graco cites also identified the reasons why Froth-Pak does not share functionality with SFE, and is not a substitute for use by a contractor. See W.D. Ex. 58 (Regan Dep. 194:6-197:14). Indeed, Mr. Regan used the phrase "Spray Foam Equipment" several times as a counter-distinction to Froth-Pak. Moreover, Mr. Regan also made the obvious point that this issue is unimportant, insofar as, regardless, Graco itself attaches no meaningful market share to Froth-Pak Id. at 195:11-13.

without need for examination of cross-elasticity of demand between SFE and those products. Nevertheless, the available data rejects the inference that there is any such cross-elasticity. If demand between SFE and these other products were cross-elastic, then Graco's explosive SFE market share acquisition would not have led to the ability to raise price, because buyers could and would have fled to those other products if they were, in fact, substitutes. If, on the other hand, SFE is a relevant market, then the presence of those other products would not inhibit Graco price increases, i.e., cross-elasticity of demand would be absent. W.D. Ex. 59. The analysis of Dr. Kamien and Mr. Regan answer this question. In particular, Mr. Regan's analysis demonstrates that Graco's acquisition of dominant market share in the SFE market led to Graco's ability to raise prices well above a standard benchmark. Regan Dec. ¶ 16; Ex. A (at 47-55, Exs 4.1 through 7.2).

while the benchmark Producer Price Index ("PPI") had risen only 24%. Id. ¶ 16, Ex. A (Exhibit 6.1). Notably, Mr. Regan's analysis not only compared Graco's SFE price increases to the PPI, but also to Graco's own pricing of products in a different, more competitive product market. He found that in that more competitive market, Id. ¶ 16; Ex A (at 51).

     Mr. Regan examined not only Graco's prices, but also its gross margins (i.e., the percentage by which its prices exceeded its costs of goods sold). He found that Graco was also enjoying ever-increasing SFE gross margins. As Graco's market share was exploding due to acquisitions, Graco's gross margins also ballooned from Regan Dec. Ex. A (at 53). This supports the inference that demand for SFE is not cross-elastic with multiple other products. In a competitive market, prices move toward variable cost, not away from it (i.e., margins shrink, not

grow).  See Barr Labs v. Abbott Labs, 978 F.3d 98, 108 n.19 (3d Cir. 1992) ("In a competitive market, unit prices tend to stabilize at the marginal cost of the most efficient producer."); United States v. Container Corp. of Am., 393 U.S. 333, 343 (1969); Regan Dec. Ex. B (at ¶ 25).  The fact that Graco's increased market share in SFE led to higher margins is compelling evidence that it is not constrained by any cross-elasticity of demand with other products.  Based on all of the above described data and evidence, Dr. Kamien opined:

> **The fact that Graco has been able to increase its Spray Foam Equipment prices and its gross margins for Spray Foam Equipment year-over-year . . . leads me to conclude that contractors are not switching to other products in response to the price increases.  That is, were there other products in the same market as Spray Foam Equipment, I would expect that as Graco increased the price of Spray Foam Equipment, demand for Spray Foam Equipment would decrease and demand for another product would increase.  In turn, I would expect this would lead to Graco decreasing the price of Spray Foam Equipment in order to respond to switching.**

Regan Dec. Ex. B (at ¶ 18); see also Regan Dec. Ex. A (at 37).  Finally, as to Graco's claim that various forms of *insulation* somehow belong in the Spray Foam *Equipment* market, Mr. Regan took the additional step of comparing Graco and Owens Corning (the pink fiberglass company) data for signs of cross-elasticity, and found that the available data showed no correlation between the price of SFE and demand for fiberglass insulation.  Regan Dec. Ex. A. (at 35-37).  In fact, a leading Graco SFE distributor *specifically rejected* the idea that price competition among insulating materials was any constraint on SFE pricing:

> **Q. Is head-to-head competition with fiberglass installation options a constraint on what you as a distributor can charge for spray foam equipment?**
>
> **A. I don't believe there is a correlation between those two.**  W.D. Ex. 8 (Donaghy Dep. 127:13-17); see also Ex. 3 (Benthien Dep. 127:13-19)**.**

Accordingly, apart from the lack of functional interchangeability, Gama's market definition is also supported by expert opinion and the data underlying that opinion. Graco's expert and its Brief argue that Mr. Regan's analysis of Graco prices is flawed. The Court can read Mr. Regan's report and draw its own conclusions, and Mr. Regan has submitted a Declaration answering Graco's criticisms, including explaining why the price study performed by Graco's expert and touted in Graco's Brief is very badly skewed. Regan Dec. ¶¶ 15-17. In any event, the experts' competing views on this point are singularly inappropriate for resolution via summary judgment. E.g., Fed. Labs v. Barringer Research, 696 F.2d 271, 274-75 (3d Cir. 1982).

### c. Graco's Own Documents Demonstrate Graco's Recognition Of A Separate Market For Spray Foam Equipment.

The existence of a SFE market is repeatedly admitted in Graco's documents and in the way its business operates. See generally Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).



Graco documents routinely measured Graco's share of the SFE market:

[Image Redacted]



[Image Redacted]

14



W.D. Ex. 65; SSUF 35-36.

 

        **d.**     **Graco's Expert Defines No Alternative Market.**

While Graco's Brief advances several product market definitions different from that found by Gama's experts, Graco's expert economist ***offers no opinion concerning what he believes is the correct market definition***. That is, while he offers a series of critiques concerning how Gama's experts have defined the market, and conjectures that "the relevant market ***may be*** significantly broader than just SFE," he does not commit to any other market definition. Graco Ex. TTT (at 3).

    **2.**     **The Evidence Supports Gama's Contention That The Relevant Market Is Limited To North American Suppliers.**

The relevant geographic market consists of the area to which purchasers "can practicably turn for supplies." Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961); Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania, 745 F.2d 248, 260 (3d Cir. 1984). The mere possibility of buying from foreign suppliers does not render them within the relevant market. Rather, "the relevant geographic area for antitrust purposes is some geographic area in which a firm can increase its price without 1) *large numbers* of customers *quickly turning* to alternative supply sources outside the area; or 2) producers outside the area *quickly flooding* the area with substitute products." Herbert Hovenkamp, Federal Antitrust Policy § 3.6 (West 2005) (emphasis added).

As explained supra, contractors purchase SFE overwhelming through distributors that can provide them with a combination of goods and services. It is not practical for buyers in North America to turn to foreign suppliers, unless those suppliers have a meaningful distribution presence here, and certainly not "quickly" "in large numbers." If in response to a price increase by a hypothetical monopolist

in the geographic area, buyers will not travel outside that area to find an alternative seller, then that area is a relevant geographic market. "Horizontal Merger Guidelines," U.S. Dep't of Justice & Fed. Trade Comm'n (2010) ("Merger Guidelines"), at § 4.2.2. W.D. Ex. 59. Graco does not even seriously argue that contractors will seek out overseas suppliers with no North American distribution channel, and Graco, of course, has the North American distribution channel blocked. See E.I. Dupont v. Kolon Indus., 637 F.3d 435, 445 (7th Cir. 2011) ("When a distant seller is prevented from effectively competing in the American market by anticompetitive conduct, the anticompetitive actor's exclusive deals prevent the distant seller from injecting a rapid influx of competing product in response to a price increase."). That there may be other suppliers making sales overseas is, therefore, of little help or consequence to North American buyers, and Gama's economist so found. Regan Dec. Ex. B (at ¶ 19); see also Regan Dec. Ex. A (at 37-40); Hry. Dec. ¶ 17.

Moreover, ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ If there were only a single worldwide market served by all suppliers, Graco's own list of fast-set competitors would have been the same in every region. Finally, this debate does not alter the outcome of this motion in any event. As discussed infra, Graco's market share -- even if the market were worldwide -- is still well above the level necessary to support the inference of monopoly power.

---

16 ████████████████████████████████████████████

████████████████████████████████████████████████

### 3. Graco Commands a Market Share in Excess of 90 Percent.

"Market share is the primary determinant of whether monopoly power exists." Pennsylvania Dental Ass'n, 745 F.2d at 260. Monopoly power "may ordinarily be inferred from a predominant share of the relevant market." E.I. du Pont de Nemours & Co., 351 U.S. at 391. As set forth in Learned Hand's famous formulation in United States v. Aluminum Co. of Am., 148 F.2d 416, 424 (2d Cir. 1945), a 33% market share is not enough to constitute a monopoly, it is doubtful whether 60 or 65% is enough, but 90% is clearly enough. "The producer of so large a proportion of the supply has complete control within certain limits." Id. at 425; see also Eastman Kodak Co. v. Image Technical Servs, Inc., 504 U.S. 451, 480 (1992) (80-95% share of the relevant market precluded summary judgment on the issue of monopoly power); Am. Tobacco Co. v. United States, 328 U.S. 781, 797 (1946) (67%); United States v. Grinnell Corp., 384 U.S. 563, 571 (1966) (87%).

Here, the evolution of Graco's dominant market share is well established in Graco's own documents. █████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Finally, in early 2008, Graco acquired GlasCraft. Graco thereafter identified Gama as ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[17] ████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ W.D. Ex. 60 (at 74).

Notably, even in a "worldwide" market, Graco's own documents acknowledge that it possesses ████████████████████████████ This remains comfortably above the levels held to create an inference of monopoly power.  See also Regan Dec. Ex. A (at 40 n.163); Ex. B (at ¶ 21: "Even if the geographic market were worldwide, which it is not, Graco's market share worldwide is 85%—well more than sufficient to exercise monopoly power.").

**4.      Graco Has Erected A High Barrier To Entry Into The Market.**

The presumption of monopoly power from a predominant market share may be overcome, if entry into the market by new competitors is sufficiently easy to deter price increases by the dominant firm.  Merger Guidelines, at § 9.  Market power concerns are not alleviated merely because some entry is possible.  Rather, to counteract the market power concerns that accompany a predominant market share, new entry must be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."  Merger Guidelines, at § 9; Dentsply, 399 F.3d at 194-96; Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1440 (9th Cir. 1995) (citing Merger Guidelines).  Graco's control over the installed base of SFE distributors is a formidable barrier to market entry, making "timely, likely, and sufficient" new entry into the market implausible.  Just as people do not buy their automobiles directly from Ford or Chrysler or GM, but instead buy through dealers, spray foam insulation contractors do not typically buy SFE directly from manufacturers.  Hry. Dec. ¶ 14; W.D. Ex. 3 (Benthien Dep., 93:3-21); Ex. 4

---

[18] Simple math also demonstrates that Graco's market share as of 2009 had reached 95+%.  That is, ████████████████████████████████████████
████████████████████████████████████, compared to Gama's of $1.6 million, yielding a market split of roughly 96% to 4%.  Regan Dec. Ex. A (at 25 n.94; W.D. Ex. 58 (Regan Dep. 85:14-86:21).

(Tate Dep., 104:24-105:14). There are several reasons for this, including the need for training, service, replacement parts, and one-stop shopping. Hry. Dec. ¶ 14; W.D. Ex. 3 (Benthien Dep., 93:3-21), Ex. 23 (Nick Dep., 15:24-16:4).

For these reasons, sale of SFE has historically occurred almost universally through distributors, and there is no reasonable prospect for gaining a significant market share without access to the incumbent distributor base. This has been a well known feature of this marketplace for many years. Hry. Dec. ¶¶ 15-17. Graco's own Product Marketing Manager admitted that ████████████████████████████

The development of new distributors is a poor, inefficient, and very slow substitute for access to the existing distributor base. It has always been the distributors, not the manufacturers, who have the key customer relationships with the contractors who buy SFE. Without access to the distributors whom the contractors have been doing business with for years, a manufacturer like Gama is cut off from the most important and only effective means of getting its product in front of would-be buyers. Hry. Dec. ¶¶ 33-34; <u>see also</u> W.D. Ex. 8 (Donaghy Dep., 23:4-25:17 (explaining that contractors rarely change distributors)) and 3 (Benthien Dep., 93:3-21 (explaining that it is not an easy process for a distributor to develop "the whole package" of necessary services)). SSUF 22.

Graco's own documents and witnesses confirm that the existing distribution network is a high barrier to entry. As early as 2002, referring to Gusmer, Graco recognized that ████████████████████████████



Graco's own leading distributors have testified that it is not possible to compete for and gain a substantial share of the SFE market without access to the top distributors:

> **Q   If a competitor of Graco's in the [SFE] industry was denied access to those top-tier distributors, that roughly half dozen, would it be possible for such a competitor to obtain a substantial share of the Spray Foam Equipment market, in your opinion, based on your knowledge and experience in the industry?**
>
> \*       \*       \*
>
> **A   My opinion is that, no, they would not. . . . They would not be able to obtain a large market share without the core distributors that are already in the spray foam industry.**

W.D. Ex. 8 (Donaghy Dep., 22:13-24:5); Ex. 10 (DeMita Dep., 80:25-81:7 (Q.  "[I]f someone attempting to enter the [SFE] market did not have access to any of the top volume distributors, would it make it substantially more difficult for that new market entrant to compete against Graco?  A.  I believe so, yes.")).  Indeed, when Graco was the newcomer and Gusmer was the incumbent,



Prior to Graco's monopolization, it was commonplace for the major distributors of SFE to carry multiple brands, including those of the three leading companies: Gusmer, GlasCraft and Graco. W.D. Ex. 3 (Benthien Dep., 90:25-91:2) and 8 (Donaghy Dep., 12:12-14:22); Hry. Dec. ¶¶ 2, 18; SSUF 17. Thus, when Graco was new to the market and attempting to compete against Gusmer for share, the established distribution network provided a ready access point. In fact, Graco's competitive strategy at that time was ███████████████████████████████ ███████████████████████████████████████████████████. Once Graco became the dominant seller, Graco seized on ██████████████████████: closing the distribution channel to new rivals. Thus, Graco raised in front of new rivals a considerable barrier to entry that Graco had not itself faced. Even Graco's antitrust expert concedes that a meaningful barrier to entry exists when new entrants confront obstacles that were not present for the dominant incumbent. W.D. Ex. 62 (Warren-Boulton Dep., 37:8-17).

Nor can the distribution channel barrier to entry be overcome by attempting to induce distributors to abandon Graco in favor of Gama. Incumbent distributors cannot afford to take on a new competitive line, if they risk the loss of access to Graco products, and a new competitor, like Gama has no way to compensate the distributors to induce them to make such a switch. SSUF 24. The reason for this is the sizable Graco installed base of sold units. Graco has been the overwhelmingly dominant seller for a period of years now. As a result, the vast majority of machines in the field are Graco machines. Distributors of SFE make as much as 50% or more of their SFE revenue from the sale of repair and maintenance services (including warranty service) and spare parts. Hry. Dec. ¶ 7; ███████████████████████████████ ███████████████████████████████████████████████. Say, for example, that a distributor has customers with a total of 20 Graco machines in the field. If, as a consequence of selling new machines made

by Gama, that distributor loses its Graco distributorship, and therefore the ability to perform warranty service and sell Graco-made spare parts, that distributor suffers an immediate, significant blow to revenues. In exchange, all it receives is the revenue it earns on the new Gama machines. No amount of price cutting by Gama could make up for the difference. Thus, there is no way for new entrants to induce such a distributor, faced with an all-or-nothing choice, to switch. It would take years for such a switching distributor to develop an installed base of the new entrants' machines large enough to raise its revenues back to what they had been before the switch. Hry. Dec. ¶ 27; <u>Dentsply</u>, 399 F.3d at 196. Graco understood this dynamic. When Graco forced the "all or nothing" choice upon Foampak, as detailed above, Graco knew it had offered Foampak no choice at all. SSUF 24. ████████████

████████████████████████████████████

████████████████████████████████████████

The Third Circuit has expressly held that the unwillingness of distributors to risk the wrath of the dominant supplier renders a distribution network a significant entry barrier. <u>Dentsply</u>, 399 F.3d at 194-96. Based upon these dynamics, Gama's experts have opined that Graco's control of the distribution channel is a barrier to entry. Regan Dec. Ex. A (at 19-21, 45-47); Ex. B (at ¶ 22). These opinions are supported by the substantial evidence discussed above. Thus, substantial, credible evidence prevents summary judgment for Graco on the issue of entry barriers.

**B.     Alternatively, There is Direct Evidence of Graco's Monopoly Power, Making Circumstantial Proof Via Market Structure Unnecessary.**

Point I.A above has demonstrated that Gama has sufficient evidence of Graco's market power using the so-called circumstantial approach, i.e. examining the market's structure. <u>Dentsply</u>, 399 F.3d at 187. Gama is not required, however, to prove Graco's monopoly power through this structural approach. Rather, alternatively, "monopoly power may be proven directly by evidence of the control

of prices or the exclusion of competition." Broadcom, 531 F.3d at 307 n.3. Importantly, "[b]ecause market share and barriers to entry are merely surrogates for determining the existence of monopoly power," proof of those structural facts is unnecessary where there is direct evidence of monopoly power; thus, "a relevant market definition is not a necessary component of a monopolization claim where there is direct evidence of monopoly power." Id. (citations omitted). Because Gama has presented substantial direct evidence of Graco's ability to control price or exclude competition, summary judgment would be unwarranted even if Graco were correct in its attacks on Gama's market structure evidence, which it is not.

Gama incorporates here the discussion of Graco supracompetitive prices and margins discussed above. Graco has been able to raise prices at a rate ███████ ███████████████ as market output fell and its gross margins ballooned. Regan Dec. ¶¶ 16-17 and Ex. A, at 47-51. ██████████████████████████ ████████████ precisely the opposite of what one would see in a competitive market. See Barr Labs, 978 F.3d at 108 n.19; see also Regan Dec. Ex. B (at ¶ 25). In fact, an internal 2008 Graco document █████████████████████████ ████████████████████████████████████████████████████████████



Notwithstanding exceptionally attractive margins that should attract market entry, Graco has been able to exclude competition through its stranglehold on the distribution channel, thus, necessarily restricting total market output and choices available to buyers. Gama's evidence of Graco's actual ability to exclude, discussed elsewhere in this Brief, is substantial. In light of all the available data, Gama's expert economist concluded: **"Separate and independent of the [market**

<hr />

[20] █████████████████████████████████████████████████████████████████

structure] factors above, the data produced by Graco in this case lead me to
conclude that there is clear and direct evidence of Graco's monopoly power in
the Spray Foam Equipment market." Regan Dec. Ex. B (at ¶ 24). Because
Gama has come forward with direct evidence of Graco pricing above the
competitive level, and controlling access to the market, it has sustained its burden on
the monopoly power element of the offense, regardless of the outcome of the market
structure issues addressed in Point IA above.

**C.    Graco Has Abused Its Monopoly Power.**

Gama has also presented compelling evidence of the second element of
monopolization: anticompetitive conduct. "A monopolist willfully acquires or
maintains monopoly power when it competes on some basis other than the merits."
LePage's v. 3M, 324 F.3d 141, 147 (3d Cir. 2003). "Anticompetitive conduct can
come in too many different forms, and is too dependent upon context, for any court
or commentator ever to have enumerated all the varieties." LePage's, 324 F.3d at
152. The particular strategy employed by Graco here, however, has been
condemned by both the Supreme Court and the Third Circuit in two controlling
cases that Graco's Brief fails to cite: Lorain Journal Co. v. United States, 342 U.S.
143 (1951), and Dentsply, supra.

Lorain Journal concerned the publisher of the only newspaper in Loraine,
Ohio (the "Publisher"), who thus enjoyed a monopoly over the dissemination of
news and advertising. 342 U.S. at 146-47. That monopoly was challenged by the
launch of a local radio station that sought to compete with the Publisher for the
patronage of advertisers. Id. at 147-48. In response, the Publisher refused to sell
advertising to any buyer who also bought advertising from the radio station. Id. at
148-49. The strategy was effective because advertisers could not afford to lose
access to the Publisher's newspaper when confronted with this all or nothing choice.

Id.  Holding that the Publisher's behavior was anticompetitive, the Court rejected one of the very arguments advanced by Graco here:

> **The publisher claims a right . . . to select its customers and to refuse to accept advertisements from whomever it pleases. . . .  The right claimed by the publisher is neither absolute nor exempt from regulation.  Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act.**

Id. at 155.  In Dentsply, the Third Circuit confronted the very circumstance presented here -- a monopolist's restriction of a rival's access to the distribution network.  Dentsply dominated the market for the sale of prefabricated, artificial teeth with a 75-80% market share.  399 F.3d at 184.  Artificial teeth were predominantly sold through "dealers" (distributors), who in turn sold to dental laboratories.  Some sales were, however, made directly to the labs.  Id. at 191-94.

The case centered on Dentsply's misuse of "Dealer Criterion 6" in its distributor agreements in a manner identical to Graco's misuse of its "Best Efforts Clause" here.  Dealer Criterion 6 provided dealers could not add additional competitive lines to their product offerings, beyond those they were already carrying.  Id. at 185.  Citing evidence that Dentsply's enforcement of Dealer Criterion 6 was designed to exclude rivals and that dealers were reluctant to risk their relationship with Dentsply, the Third Circuit condemned Dentsply's behavior as unlawful monopolization.  Id. at 196.  The court unambiguously rejected the same key contentions now made by Graco here.  First, the court rejected the argument that Dentsply's conduct was not exclusionary because rivals could still make some direct sales to the labs, bypassing the leading distributors locked up by Dentsply:

> **The reality in this case is that the firm that ties up the key dealers rules the market.**

*          *          *

> **That some manufacturers resort to direct sales and are even able to stay in business by selling directly is insufficient proof that direct selling is an effective means of competition.**

Id. at 190, 193.  Thus, Graco can find no refuge in its argument that the tiny direct sales channel offered a market access alternative to Gama.  See Graco Brief at 33.

Next, the court rejected the argument that Dentsply's conduct was not exclusionary because its dealer relationships were terminable at will by the dealers, such that those dealers were theoretically free to switch to other suppliers at any time: "Dentsply sells teeth to the dealers on an individual transaction basis and essentially the arrangement is 'at-will.' . . .[I]n spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying Dentsply's teeth."  Id. at 193-94.  Thus, Graco can find no refuge in its argument that its distributors are "free to switch."  See Graco Brief at 31-33.

Finally, the court concluded that Denstply's conduct was unlawful, despite the fact that when Dentsply began enforcing its Dealer Criterion 6 it grandfathered those dealers who were already selling the products of existing rivals, thus enforcing its restriction only as to new rival products.  Id. at 185.  Thus, Graco cannot defend itself by claiming that, when it began enforcing its "Best Efforts" clause to forbid distributors from taking on "new competitive lines," it supposedly grandfathered in tiny existing rivals such as 21st JMT or the soon-to-be acquired GlasCraft.  In any event, Graco has since purchased GlasCraft, and Graco has itself characterized 21st JMT as a company ███████████████████████████████████ ██████ see also Hry. Dec. ¶ 6.

The evidence presented by Gama supports the same inferences and conclusions reached in Dentsply, making summary judgment for Graco impossible.  Yet, ignoring Lorain Journal and Dentsply, Graco suggests instead that its conduct is immune because Gama's claim "ignores the bedrock principle of antitrust law that

firms are free to choose with whom to deal." Graco Brief at 30. For this proposition, Graco relies upon the Supreme Court's decisions in <u>Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.</u>, 129 S. Ct. 1109 (2009) and <u>Verizon Commc'ns, Inc. v. Law Offices of Trinko</u>, 540 U.S. 398 (2004). <u>Pac. Bell</u> and <u>Trinko</u> are simply irrelevant to the issue presented here. Both cases deal with the entirely different issue of when, if ever, a monopolist has a duty to deal ***directly with its rival***. See <u>Pac. Bell</u>, 129 U.S. at 1119 ("In this case, as in <u>Trinko</u>, the defendant has no antitrust duty to deal ***with its rivals*** . . . ."). Nothing in either opinion undermines the holdings in <u>Lorain Journal</u> and <u>Dentsply</u> concerning the very different circumstance in which a monopolist threatens to cut off a ***third-party*** buyer or distributor in order to induce that third party to refuse to deal with the monopolist's rival. <u>Dentsply</u> was decided after <u>Trinko</u>, and remains the undisturbed law of this Circuit. <u>Lorain Journal</u> remains a pillar of Section 2 jurisprudence, and has been repeatedly relied upon by the Third Circuit, including for <u>Lorain Journal</u>'s characterization of the Publisher monopolist's behavior in that case as "bold, relentless and predatory." <u>Le Page's</u>, 324 F.3d at 150. <u>See also</u> <u>Dentsply</u>, 399 F.3d at 186-87 (relying on <u>Lorain Journal</u>).[21]

Nor can Graco find solace in its alternative argument that "exclusive distribution arrangements are generally pro-competitive." Graco Brief at 30. Exclusive distribution arrangements are commonplace, and they generally present modest antitrust concern because they are most often used by firms that ***lack monopoly power***. As <u>Dentsply</u> makes abundantly clear, however, the result is very different when exclusivity is used by a monopolist to preserve that monopoly. 399 F.3d at 187 ("Behavior that otherwise might comply with antitrust law may be

---

[21] <u>See</u> <u>also</u> Assistant Attorney General Christine A. Varney, "Vigorous Antitrust Enforcement In This Challenging Era," Remarks Prepared for the Center for American Progress , www.justice.gov/atr/public/speeches/245711.htm (5/11/2009).

impermissibly exclusionary when practiced by a monopolist."); see also LePage's, 324 F.3d at 151-52 ("a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take"). Graco's behavior as a firm with monopoly power is precisely the behavior that has been condemned as predatory in the cases the control here.[22]

### D.     Gama Has Sufficient Evidence Of Harm To Itself And To Competition.

Graco mistakenly argues that Gama lacks evidence of harm to competition or itself because (1) there is no evidence that buyers are paying higher prices or are being deprived of choice, (2) there is no evidence that Gama has lost sales, and (3) Gama has not been foreclosed from the market because it has access to sales avenues other than the channel closed by Graco. Graco Brief at 33-34. As already discussed, Gama has supplied extensive expert analysis that Graco's prices and gross margins have risen supracompetitively as its market share has grown to 90+%. Regan Dec. ¶ 16; Ex. A (at 47-55, Exs 4.1 through 7.2).[23] Gama's expert has

---

[22]  Graco's argument at pages 30-31 of its Brief that exclusive dealing arrangements are "generally" pro-competitive cites only caselaw and makes no attempt to demonstrate that the exclusion was, in this case, actually pro-competitive. As this is the only argument advanced in the Legal Argument section of Graco's Brief that its conduct was pro-competitive, it is the only such argument we have addressed. At other times in this litigation, Graco has suggested that its conduct is justified by its contention that Defendants were or are selling products that incorporate trade secrets misappropriated from Graco. Graco has not raised that issue in its legal argument for summary judgment, presumably in recognition of the fact that the issue is substantially controverted. See Declarations of Fred Smith, Brent Lucas, and Hamayoon Kazerooni. Therefore, neither do we address it here. However, see generally Memorex v.IBM, 555 F.2d 1379, 1382-83 (9th Cir. 1977). In any event, Graco's stated concerns about "goodwill" and "free riding" are pretext. See Response to SUF, at 32, 34, 37, 60-63; see generally Dentsply, 277 F. Supp. 2d 387, 453 (D. Del. 2003) (discussing pretext).
[23]  Graco also obsoleted and dramatically increased the price of the industry favorite Gusmer H20/35 in order to drive the market to its other models. Hry. Dec. ¶ 3;

calculated that Graco has already extracted more than $9 million excess monopoly profits. Regan Dec. Ex. A (at 69-77 and Exs 3.1 - 3.3). That Graco's expert is of a different opinion is no basis for summary judgment, particularly because his analysis suffers from a rather serious and obvious flaw. Regan Dec. ¶¶ 6-8.

Mr. Regan also opines that Graco's anticompetitive conduct has caused Gama millions of dollars in lost profits. Regan Dec. Ex. A (at 77-91, Exs 1A - 1B). Graco's damages expert, assuming liability, posits a dramatically lower number, <u>see</u> Graco Ex. WWW (Snelson rebuttal), but the quantum of damages is not at issue in this motion. Apart from expert analysis, however, there is also witness testimony concerning specific sales opportunities Gama lost to the Graco roadblock. Hry. Dec. ¶¶ 23-24; W.D. Ex. 140 (Sica Dec). W.D. Ex. 8 (Donaghy Dep., 77:16-25 ("The [Boycott] letter is the sole reason why I stopped pursuing the Gama distributorship.")); 45 (at 33); and 50 (Delaune Dep., 102:14-103:9, 105:25-106:8). It is also useful to look at history. ██████████████████████████████ Now that Graco is the dominant supplier, by preventing Gama from using the same strategy for winning share away from the dominant firm, Graco has artificially held Gama' share under 5%. Regan Dec. Ex. A (at 78-82).

Finally, Graco argues that competition is unharmed by foreclosing Gama's access to the key distribution network, because other lesser avenues to the market

are open. Total foreclosure, however, is not the test. The argument advanced by Graco was unambiguously rejected in <u>Dentsply</u> after the district court erroneously found that competitive foreclosure was absent because "other dealers were available and direct sales to laboratories was a viable method of doing business." <u>Dentsply</u>, 399 F.3d at 185-86. Reversing, the Third Circuit held that total foreclosure was unnecessary to find competitive harm where access to the "key dealers" had been restricted. <u>Id.</u> at 191-93, 196 ("There are other ways across the 'river' to consumers, but high volume retailers provided the most effective bridge."); <u>see also</u> <u>LePage's</u>, 324 F.3d at 158-60; <u>United States v. Microsoft</u>, 253 F.3d 34, 70-71 (D.C. Cir 2001) (anticompetitive effect found where Microsoft "restricted Netscape's access to those distribution channels leading most efficiently to the acquisition of browser usage share"). In Point I.A.4. above, Gama set forth the considerable evidence that access to the incumbent, key distributors is the only efficient path to the marketplace, and the only means of accumulating enough share to threaten Graco's monopoly. <u>Dentsply</u>, 399 F.3d at 185-86, 191-93; Hry. Dec. ¶¶ 33-34; W.D. Ex. 83 (Kamins Dep., 120:15-121:5). Graco has admitted ████████████████████████████
████████████████████████████████████████████████████

Indeed, upon seeing a list of distributors to whom Gama sent marketing materials, ████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████ This case is on all fours with <u>Dentsply</u>; summary judgment on anticompetitive effect is impossible.[24]

_____

[24] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

## II.  GRACO HAS UNLAWFULLY ATTEMPTED TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

The elements of attempted monopolization are (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of achieving a monopoly.  Spectrum Sports, Inc. v. McQuillan, 506. U.S. 447 (1993).  Graco's Brief directs no separate argument at these elements beyond the arguments it asserts generally concerning market definition, monopoly power and anticompetitive conduct.  Gama likewise incorporates here its prior arguments on those issues.  With respect to monopoly power, however, courts have routinely held market shares in excess of 50% sufficient to raise a "dangerous probability" of monopoly.  E.g., Acme Mkts. v. Wharton Hardware & Supply Corp., 890 F. Supp 1230, 1241 (D.N.J. 1995) ("When the defendant controls 50% or more of the market, anticompetitive conduct is conclusively presumed by Areeda and Turner to constitute attempted monopolization.").  Finally, Graco's Brief does not seek summary judgment with respect to the specific intent element, nor argue that it is lacking.  As Graco has not raised this element as a basis for seeking summary judgment, Gama does not address it here

## III.  GAMA HAS STANDING TO PURSUE CLAIMS FOR THE ENTIRE PERIOD OF GRACO'S ANTITRUST VIOLATION.

For approximately the first two years of its existence, Gama acted as the exclusive importer and master distributor of SFE manufactured by Garraf in Spain. Thereafter, Gama began selling SFE of its own design and manufacture.  Hry. Dec. ¶ 11.  Graco argues that Gama lacks standing to pursue claims for its injuries during the period when Gama was selling Garraf equipment (hereafter "the Garraf Period"), because Gama was not Graco's "competitor" at that time.  Graco is mistaken.

Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 545 (1983) ("AGC") sets forth the factors to consider when assessing an antitrust claimant's standing: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause harm, (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress, (3) the directness of the injury, (4) the existence of more direct victims, and (5) the potential for duplicative recovery or complex apportionment of damages. In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 114, 1163 n.9 (3d Cir. 1993) (summarizing AGC).

Graco does not dispute that Gama's injuries satisfy factors (1) and (2) of the AGC test. Rather, Graco merely cites this Court's earlier observation in footnoted, pre-discovery *dicta* that Gama's claims during the Garraf Period "may not" satisfy factors (3), (4) and (5). Graco Brief at 34-35 (citing ECF 81, at 62 n.27). Without then addressing any of those factors, Graco's entire argument is the proposition that Gama lacks standing for the Garraf Period because it was not Graco's "competitor." The Third Circuit has made clear, however, that simply applying the label of "non-competitor" as an alleged bar to standing cannot be reconciled with the factor-based analysis required by AGC. Carpet Group Int'l v. Oriental Rug Importers Ass'n, 227 F.3d 62, 76-77 (3d Cir. 2000). Graco's effort to obtain summary judgment by stating nothing more than the bald conclusion that Gama was not a "competitor," therefore, is unavailing. In fact, Gama was a competitor. See discussion infra.

In any event, the injury to Gama was, in fact, direct, and no more direct victim exists. As discussed above, Gama's injury flows from being foreclosed the opportunity to make sales through the same incumbent SFE distributors to whom Graco is selling. The lost sales were felt first and most directly by Gama. If anything, it was the injury to Garraf, one step further removed from the buyers

- 35 -

whose patronage is at the heart of this case, that was indirect.  The <u>AGC</u> test is well satisfied by the facts of this case.[25]  Moreover, as <u>Carpet Group</u> states, even cases stating "generally" that only "competitors and customers" have standing have found that standing nevertheless exists "where the harm is 'inextricably intertwined' with the defendants' wrongdoing."  <u>Carpet Group</u>, 227 F.3d at 76-77.  Plainly that is the case here.  Excluding Gama was the very purpose of Graco's Boycott letter.  W.D. Ex. 1 (Baumgartner Dep., 285:11-19).  Graco's closing of the distribution channel and the harm to Gama are one and the same.

Finally, Graco is simply wrong when it attempts to label Gama, during the Garraf Period, as not a "competitor" of Graco's.  Gama plainly was Graco's direct competitor.  Each was attempting to sell SFE directly to the same universe of buyers -- the incumbent spray foam distributors.  Indeed, the relationship between Gama and Graco was even more directly competitive than that between the parties found to be "competitors" in <u>Carpet Group</u>.  There, defendants were wholesalers in the business of selling rugs to rug retailers.  227 F.3d at 63-64.  The plaintiff, on the other hand, <u>was not a seller of rugs at all</u>.  Rather, plaintiff CGI was in the business of organizing trade shows, at which retailers and consumers would have the opportunity to buy rugs directly from manufacturers.  CGI made its money by charging manufacturers a fee for space at the trade shows, not by selling rugs.  <u>Id.</u> at 64.  The Third Circuit nevertheless found that CGI and the rug wholesalers were sufficiently "in competition" with each other to confer standing upon CGI to sue for the wholesalers' antitrust violation, which, much like Graco's unlawful conduct here, consisted of threatening to boycott any manufacturer that patronized CGI's trade shows.  <u>Id.</u> at 64, 77.  So it is here as well.  Graco and Gama were plainly "in

---

[25] Additionally, there is no risk of duplicative recovery or a complex apportionment of damages, as Garraf has defaulted from this case.

competition" for the patronage of SFE distributors, regardless of whether Gama itself manufactured what it was selling.

### IV. GAMA HAS SUFFICIENT EVIDENCE TO SUPPORT THE STATE LAW COUNTERCLAIMS AGAINST GRACO

### A. Graco's Conduct Constitutes Trade Libel

The elements of trade libel are: 1) publication, 2) with malice, 3) of false allegations concerning claimant's property, product or business, and 4) special damages, i.e. pecuniary harm. Mayflower Transit, L.L.C. v. Prince, 314 F. Supp. 2d 362, 378 (D.N.J. 2004). To show malice, the plaintiff "must demonstrate that [the] statements were false or that they were written with reckless disregard for the truth or falsity." Id. A plaintiff can establish special damages by showing "a general diminution of business," id., or "pecuniary loss . . . such as lost sales, or the loss of prospective contracts with customers." Patel v. Soriano, 369 N.J. Super. 192, 249-50 (App. Div. 2004).

Graco alleges that there is no evidence of malicious publication of false statements or "special damages." On multiple occasions, however, Graco made false statements that Gama was going out of business, that Graco was closing down Gama by the end of 2008, or that consumers had to stay away from Gama products due to this lawsuit. W.D. Ex. 85; Ex. 157 (Spiess Dec. ¶ 13); Ex. 165 (Gililland Dec. ¶¶ 17-18); Ex. 114 (Hrynkiewicz Dep. 297:11-298:20; Ex. 166. Graco also campaigned to falsely inform consumers that Gama was selling "knock-off equipment" and that its products were "recycled" from Gusmer. W.D. Ex. 87-88. These false statements were made with reckless disregard for their truth or falsity.

As a result, Gama suffered pecuniary harm. Defendants have identified distributors that have refrained from dealing with Gama because of Graco's conduct and Gama has lost sales to prospective customers based on Graco's false statements. Graco Ex. VVV (at Response 14); Dec. of Ralph Terzich ¶ 2; Dec. of Dave Penta¶

2.  These forms of pecuniary harm satisfy the special damages requirement of Defendants' trade libel claim, <u>see</u> <u>Patel</u>, 369 N.J. Super. at 249-50.  Therefore, summary judgment on Defendants' trade libel claims should be denied.

**B.     Graco Engaged in Unfair Competition**

New Jersey's law of unfair competition "is an amorphous area of jurisprudence.  It knows of no clear boundaries. . . . The concept is as flexible and elastic as the evolving standards of commercial morality demand." <u>Duffy v. Charles Schwab & Co., Inc.</u>, 123 F. Supp. 2d 802, 815 (D.N.J. 2000); <u>see</u> <u>also</u> <u>Ryan v. Carmona Bolen Home for Funerals</u>, 341 N.J. Super. 87, 92 (App. Div. 2001).  Similarly, an unfair competition claim under the New Jersey Fair Trade Act, N.J.S.A. 56:4-1, is the statutory equivalent of section 43(a)(1) of the Lanham Act, which provides for civil liability where a defendant uses any "false or misleading description . . . [or] representation of fact, which -- (A) is likely to cause confusion, or to cause mistake, or to deceive . . . or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities" of another person's goods.  15 U.S.C. § 1125; <u>see</u> <u>Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.</u>, 210 F. Supp. 2d 552, 560 (D.N.J. 2002).

In this case, Graco engaged in unfair and deceptive practices by making false statements about Gama and misrepresenting Gama's products.  Graco repeatedly misled distributors by stating that Gama was going out of business, that Graco was going to close Gama down by the end of 2008 "for sure, No questions asked," and that distributors had to stay away from Gama products because of the Graco lawsuit. W.D. Ex. 85; Ex. 157 (Spiess Dec. ¶ 13); Ex. 165 (Gililland Dec. ¶¶ 17-18); Ex. 114 (Hrynkiewicz Dep. 297:11-298:20; Ex. 166

▮▮▮▮    These types of misleading and deceptive practices render competition unfair and are prohibited under New Jersey law.  See Ryan, 341 N.J. Super. at 92.

Graco asserts that these statements are not actionable because they are mere puffery.  Graco, however, did not simply use puffery in contrasting differences in products; rather, Graco made wholly false representations that Graco was closing down Gama and that distributors had to stay away from Gama products due to the pending lawsuit.  Puffery "is distinguishable from misdescriptions or false representations."  Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 464 (D.N.J. 2009).  Graco's statements go beyond puffery -- they are designed to damage Gama's trade through unfair and deceptive tactics.

**C.    Graco Interfered With Gama's Prospective Economic Advantage**

To establish a claim for tortious interference with prospective economic advantage, a plaintiff must show "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages."  Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996).  Gama has identified, supra, instances of Graco's interference with Gama's prospective economic advantage.  Graco repeatedly made false and misleading statements to Gama customers.  In addition, Graco engaged in malicious anticompetitive conduct in violation of the Sherman Act to force Gama out of the marketplace.  Graco intentionally "block[ed] the [distribution] channel" for Gama and threatened would-be buyers of Gama products with reprisals.  See supra . Graco's malice in this regard is apparent on the face of the statements by CEO Patrick McHale quoted above at pp 6-7.

Graco argues that its conduct is not illegal and that, therefore, it cannot serve as the basis for a tortious interference claim.  New Jersey law, however, does not require that the interference be illegal.  Rather, the relevant inquiry is whether the

conduct was "injurious and transgressive of generally accepted standards of common morality or of law." <u>Lamorte Burns & Co. v. Walters</u>, 167 N.J. 285, 306 (2001) (quotations omitted). "Although competition may constitute a justification, a defendant . . . must justify not only its motive and purpose, but also the means used." <u>Id.</u> Competition is "outside permissible limits" where the competitor uses "fraud, intimidation, misrepresentations, or threat[s]." <u>Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.</u>, 282 N.J. Super. 140, 206 (App. Div. 1995). In this case, Graco's motive was not to enhance competition, but to destroy it. In order to do so, Graco used false statements and misrepresentations about Gama, as well as intimidation and threats against distributors in order to prevent them from distributing Gama products. This conduct satisfies the requirement for tortious interference with a prospective economic advantage, and therefore, Graco's motion for summary judgment should be denied.

## CONCLUSION

For all the foregoing reasons, Graco's motion for summary judgment should be denied in its entirety.[26]

Of Counsel:                                     **GIBBONS P.C.**

Timothy Rooney (*pro hac vice*)                 s/ Guy V. Amoresano
David S. Bloch (*pro hac vice*)
Patrick M. Ryan (*pro hac vice*)                Michael R. Griffinger
**WINSTON & STRAWN LLP**                        Guy V. Amoresano, Esq.

August 5, 2011

---

[26] Additionally, Gama has submitted the Rule 56(d) Declaration of Guy V. Amoresano, stating reasons under that Rule for which this motion should be denied or deferred.

# APPENDIX

## TABLE OF NAMES/EMPLOYERS

| NAME | TITLE |
|------|-------|
| Arsenault, Kevin | Graco Senior Area Sales Manager |
| Baumgartner, Max | Graco Director of Sales |
| Benthien, Dick | CEO of CPI, Inc., a distributor of spray foam equipment |
| Commette, Denis | Self-employed consultant for Gama; former President of Gusmer |
| Commette, Doug | Former Executive Gusmer Corporation; Owner of several companies that serve the spray foam industry |
| Daugherty, Mark | Founder of MDI Manufacturing Co. Inc., a machining company that has done work for Gusmer and Gama |
| Delaune, Henry | President of Burtin Polymer Laboratories, a distributor of spray foam equipment |
| DeMita, Jack | Employee of CPI, Inc., a distributor of spray foam equipment |
| Donaghy, Chris | Owner of Foampak Corporation, a distributor of spray foam equipment |
| Galdonik, Michael | Graco Director of Employer Relations |
| Gililland, Patrick | Proprietor of SPF Depot, a business specializing in parts and accessories for spray foam applicators |
| Hrynkiewicz, William | Vice President of Marketing and Sales for Gama Machinery, USA; former Business Development Manager at GlasCraft; former Director of Sales at Gusmer; former Market Development Manager at Graco |

| | |
|---|---|
| Kamien, Dr. Morton | Defendants' expert economist |
| Kamins, Gary | President of PMC Global, Inc. |
| Kamins, Phillip | Chairman and CEO of PMC Global, Inc. |
| Kazerooni, Dr. Hamayoon | Expert engineering witness for Defendants |
| Lucas, Brent | Expert engineering witness for Defendants |
| McHale, Patrick | Graco CEO |
| Nick, Timothy | Founder and Owner of Sprayed Polyurethanes Engineered Coatings (SPEC) Technologies, a distributor of spray foam products |
| Pagano, Nicholas | Graco Product Marketing Manager |
| Penta, Dave | Vice President of Sales at SprayWorks Equipment Group, LLC, a distributor of spray foam equipment |
| Regan, Greg | Defendants' accounting/financial expert |
| Rennerfeldt, Eric | Graco Senior Area Manager |
| Scher, Robert | Gama executive |
| Sebion, Michael | Graco Director of Sales and Marketing |
| Sheahan, Mark | Graco Vice President of Applied Fluid Technologies Division |
| Sica, Frank | Gama executive; former sales manager at Gusmer |
| Smith, Fred | Expert engineering witness for Defendants |
| Snelson, Melissa | Graco's accounting expert |
| Spiess, Richard | Owner of Innovative Insulation Solutions Ltd. and SPF Supplies, Inc., companies that use and sell spray foam products |
| Sutter, Fred | Graco Vice President of the Applied Fluid |

|  | Technology Division |
| --- | --- |
| Tate, John | Graco North American Sales Manager |
| Terzich, Ralph | Managing Member of Impact Polyurethane Chemicals, LLC, a distributor of spray foam equipment |
| Tolbert, Clarence | Vice President of NCFI Polyurethanes, a seller of spray foam equipment |
| Warren-Boulton, Dr. Frederick | Graco's expert economist |

**Exhibit "H"**

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

INSULATE SB, INC., a California
Corporation, individually and on behalf
of all others similarly situated,

       Plaintiff,

v.

ABRASIVE PRODUCTS &
EQUIPMENT, et al.,

       Defendants.

Civil Action No. 1:13-cv-01609-YK
(Chief Judge Yvette Kane)

## PLAINTIFF'S PROPOSED PROTECTIVE ORDER

WHEREAS, the parties herein recognize that the exchange and/or disclosure

of documents, or information in the above-captioned action may involve

confidential information (herein referred to as "Confidential information") and that

access to that Confidential Information should be restricted;

WHEREAS, the parties desire to maintain the confidentiality of such

Confidential information and protect it from disclosure other than as expressly

permitted by this Stipulated Protective Order;

WHEREAS, the parties, through counsel, stipulate that the good cause

standard set forth in *Pansy v. Borough of Stroudsburg*, 23 F.3d 773 (3d Cir. 1994)

exists for entry of this Stipulated Protective Order pursuant to Rule 26(c) of the

Federal Rules of Civil Procedure to protect against improper disclosure or use of confidential information produced or disclosed in this case;

WHEREAS, by entering into this Stipulated Protective Order, no party is acknowledging that another party's designation of materials as being a trade secret or otherwise protectable as confidential/proprietary information is valid or enforceable, and no party is waiving its right to challenge another party's designation as such; and

WHEREAS, the parties have agreed that Confidential information shall be given the protection described below;

NOW, THEREFORE, the parties, by their undersigned attorneys of record, hereby stipulate as follows:

1.     As used in this Protective Order, these terms have the following meanings:

a.     "Confidential" materials are materials designated pursuant to paragraphs 2, 3;

b.     "Confidential - Attorneys Eyes Only" materials are the subset of Confidential materials designated pursuant to paragraph 4;

c.     "Documents" are all materials within the scope of Fed. R. Civ. P. 34;

d.     "Independent Expert" means persons with whom counsel for the parties may deem it necessary to consult concerning technical,

2

financial, or other aspects of this case for the preparation or trial thereof;

provided, however, that for purposes of information designated

"Confidential-Attorneys Eyes Only" no party may treat as an Independent

Expert any of that party's current employees who may be identified as

expert witnesses during the course of this action (including any part-time

employees and contractors paid on a Form 1099 basis);

   e. "Written Assurance" means an executed document in the

form attached as Exhibit A.

   2. This Order shall govern all documents and other materials containing

proprietary and confidential information and/or trade secrets (hereinafter referred

to collectively as "CONFIDENTIAL" information produced by a party (the

"producing party") in response to any discovery initiated or conducted by another

party in this action (the "requesting party").

   3. A party may designate as "Confidential" any materials including, for

example, documents, interrogatory responses, other discovery responses, or

transcripts, that it in good faith contends constitutes or contains Confidential

Information that is not generally known and for that the party would normally not

reveal to third parties or would require third parties to maintain in confidence

   4. A party may designate as "Confidential — Attorneys Eyes Only" any

materials including, for example, documents, interrogatory responses, other

discovery responses, or transcripts, that it in good faith contends constitutes or

contains Confidential Information requiring special protection such as trade
secrets, proprietary technical information, financial data, strategic plans, long-
range plans, internal cost or expense data, contracts and agreements with third
parties, research and development documents, and technical or business
information that a party in good faith regards as competitive sensitive information.

5.     Any producing party may, in good faith, designate any document,
material or information, including any transcript or any portion of any transcript of
testimony in this action as "Confidential" or "Confidential - Attorneys Eyes Only"
subject to the terms or this Stipulated Protective Order.  Said designation may be
accomplished at the time that the documents are produced or at the time of the
testimony of the Confidential Information, subject to the provisions of paragraph 6
by (i) providing written notice to the other parties; (ii) making a statement to that
effect on the record of any proceeding; or (iii) stamping the document, material, or
information with the legend "Confidential" or "Confidential - Attorneys Eyes
Only."  A party or third party that makes original documents or materials available
for inspection need not designate them for protection until the inspecting party has
indicated which material it would like copied and produced.  During the inspection
and before designation, all of the materials made available for inspection shall be
deemed "Confidential — Attorneys Eyes Only."  Documents produced in the
course of discovery herein (either formally or informally) that the producing party
deems to contain Confidential Information may be designated as confidential by

the producing party, and the documents or portions thereof deemed to be confidential that are copies and delivered to the receiving party shall be marked "Confidential" or "Confidential - Attorneys Eyes Only.

6.     All documents, material and information designated as "Confidential" or "Confidential — Attorneys Eyes Only" (including documents, material and information that disclose the content of any document, material or information designated as "Confidential" or "Confidential - Attorneys Eyes Only") shall be used by the receiving party solely for purposes of this action and for no other purpose whatsoever.  A person with custody of "Confidential" and "Confidential - Attorneys Eyes Only" documents, material or information shall maintain it in a manner that assures that access to it is strictly limited to persons entitled to receive said documents or information in accordance with the provisions of this Stipulated Protective Order.

7.     No copies of any material marked CONFIDENTIAL shall be made except by or on behalf of counsel for the named parties; any such copies shall also be designated and treated as CONFIDENTIAL and shall not be delivered or exhibited to any persons except as provided in this Order.

8.     The inadvertent production or disclosure of any confidential document, material or information without a "Confidential" or "Confidential - Attorneys Eyes Only" designation shall be without prejudice to the parties' rights under this Stipulated Protective Order, and the parties shall retain the right

DM1\3939738.1

thereafter to designate such document, material or information as "Confidential" or "Confidential - Attorneys Eyes Only".

9.     Nothing in this Stipulated Protective Order shall be deemed a waiver of the attorney-client, work product or any other privilege or immunity, or of the right of any party to this action to oppose production of any information or documents as being outside the scope of discovery.

10.     Inadvertent production of documents subject to work product immunity or the attorney-client privilege or any other privilege or immunity shall not constitute a waiver of the immunity or privilege, provided that the producing party promptly notifies the receiving party in writing of such inadvertent production after the producing party learns of such inadvertent disclosure.  No party shall thereafter assert that such inadvertent production waived any privilege or immunity.  The receiving party shall return such inadvertently produced item(s) of information and all copies thereof within ten (10) business days after the earliest of (a) discovery by the receiving party of its inadvertent production, or (b) receiving a written request from the producing party for the return of such item(s).  The receiving party having returned such inadvertently produced item(s) may thereafter, without asserting waiver because of the inadvertent production, seek production of any such item(s) in accordance with applicable law.

11.     Any transcript of deposition or trial testimony that concerns any document, material or information designated as "Confidential" or "Confidential -

6

Attorneys Eyes Only" shall be subject to the terms of this stipulation.  The party or third party offering or sponsoring the testimony may identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony, and further specify any portions of the testimony that qualify as "Confidential" or "Confidential - Attorneys Eyes Only."  Alternatively, the party or third party that sponsors, offers, or gives the testimony has up to thirty (30) days from the receipt of the written transcript to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted ("CONFIDENTIAL" or "CONFIDENTIAL - ATTORNEYS EYES ONLY").  Additionally, within said thirty (30) day period, the designating party may make alterations to the designations which were made on the record at the deposition or hearing.  Until said thirty (30) day period expires, the entire deposition or hearing transcript shall be presumed to be "Confidential -Attorney's Eyes Only".  Only those portions of the testimony that are appropriately designated for protection as set forth in this paragraph shall be covered by the provisions of this Order. Transcript pages containing designated information must be separately bound by the court reporter, who must affix to the top of each such page the legend "Confidential" or "Confidential — Attorneys Eyes Only," as instructed by the party or third party offering or sponsoring the witness or presenting the testimony.

12.    Material marked CONFIDENTIAL may be inspected only by the following persons:

7

a.      the parties hereto including, but not limited to employees and/or in-house attorneys, and their support staff, to whom disclosure of the information is reasonably necessary for this litigation and who have signed the Written Assurance that is attached hereto as Exhibit A (the originals of which shall be maintained by each party's own outside counsel);

b.      outside counsel and their support staff, including any outside copy service or litigation support assisting in the preparation of this action;

c.      court reporters, their staff, and professional vendors to whom disclosure of the information is reasonably necessary for this litigation and who have signed the Written Assurance;

d.      independent experts retained or consulted by the receiving parties, whether or not ultimately called to testify in this action to whom disclosure of the information is reasonably necessary for this litigation and who have signed the Written Assurance;

e.      the Court and its personnel;

f.      any third party neutral, including but not limited to a mediator or arbitrator, approved of in writing by all parties who executes the Written Assurance; and

g.      any person who has or had demonstrable possession of the document, material or information (including without limitation the author and recipients thereof) without breach of any agreement or duty of confidentiality

8

independent of this action.

13.    Documents, material and information designated as "Confidential - Attorneys Eyes Only" shall not be disclosed by a receiving party to any person except:

a.    outside counsel for the parties to this action who are not employees of the parties, and their authorized secretarial and legal assistant/support staff;

b.    in-house attorneys for each party and their authorized secretarial and legal assistant/support staff whose duties and responsibilities require access to such information; provided however, that any such in-house attorney and shall each execute a copy of the Written Assurance; and

c.    those persons identified in paragraphs 11(c)-(g) above.

With the exception of those individuals specifically identified in this paragraph, no documents or information designated "Confidential - Attorneys Eyes Only" shall be disclosed to any party to this action or to any officer, director, employee (including part time employees and contractors paid on a Form 1099 basis) or agent of any party, except by written stipulation of the parties or by order of the Court.  No person receiving such designated materials shall, directly or indirectly, transfer, disclose, or communicate in any way the contents of the materials to any person other than those persons authorized to have access to such information.

14.     Documents, material and information designated as "Confidential" or "Confidential - Attorneys Eyes Only" shall only be provided to those persons identified above who have been advised that such document or information is being disclosed pursuant to and subject to the terms of this Stipulated Protective Order, and may not be disclosed other than pursuant to the terms hereof.  Potential witnesses shall sign a Written Assurance confirming that "Confidential" or "Confidential - Attorneys Eyes Only" documents and/or other information provided to him or her will not be disclosed to any other person or used in any manner except for the purposes of this action.  Such signed agreements shall be retained by the party disclosing confidential documents or information to such persons and shall be provided to the other parties to this stipulation on a showing of a reasonable belief that a violation of a term thereof may have occurred.

15.     A party requesting that a record be filed under seal must file a motion or an application for an order sealing the record with the Court's rules and procedures.

16.     A party that files or intends to file with the court, for the purposes of adjudication or to use at trial, records produced in discovery that are subject to a confidentiality agreement or protective order, and does not intend to request to have the records sealed, must:

a.     Lodge the unredacted records subject to the protective order and any pleadings, memorandums, declarations, and other documents that disclose

the contents of the records;

      b.    File redacted copies of the documents so that they do not disclose the contents of the records that are subject to the protective order; and

      c.    Give written notice to the party that produced the records that the records and the other documents lodged will be placed in the public court file unless that party files a timely motion or application to seal the records.

      d.    If the party that produced the documents and was served with the notice fails to file a motion or an application to seal the records within 10 days or to obtain a court order extending the time to file such a motion or an application, the clerk must promptly remove all the documents from the envelope or container where they are located and place them in the public file. If the party files a motion or an application to seal within 10 days or such later time as the court has ordered, these documents are to remain conditionally under seal until the court rules on the motion or application and thereafter are to be filed as ordered by the court.

      17.    Any document, material or information supplied by a third party may be designated by such third party or by any party to this proceeding as "Confidential" or "Confidential Attorneys Eyes Only" under the terms of this Stipulated Protective Order, and such designation by any third party shall have the same force and effect as if made by a party.  A copy of this Protective Order shall be served along with any subpoena served in connection with this action.  All documents produced by such third parties shall be treated as "Confidential -

11

Attorneys Eyes Only" for a period of 15 business days from the date of their production, and during that period any party may also designate such documents as "Confidential" or "Confidential Attorneys Eyes Only" pursuant to the terms of this Stipulated Protective Order.

18.     Any party may request a change in the designation of any information. Such request shall be written and served on counsel for the producing party and shall particularly identify the designated information that the receiving party contends is not properly designated and reasons supporting its contention.  Any such information shall be treated as designated unless and until the change is completed.  If the requested change in designation is not agreed to, the party seeking the change may move the Court for appropriate relief, providing notice to any third party whose designation of produced documents in the action may be affected.  The party asserting that the material is not properly designated shall have the burden of proving that the information in question is or is not within the scope of protection afforded by Fed. R. Civ. P. 26(c) or the provisions of this Stipulated Protective Order.  Nothing in this Stipulated Protective Order shall be deemed to preclude any party from seeking and obtaining, on an appropriate showing to the Court, such additional protection with respect to Confidential Information as that party may consider appropriate.

19.     Jurisdiction of this action is to be retained by this Court, after final determination, for purposes of enabling any party to this Stipulated Protective

Order to apply to the Court for such direction, order or further decree as may be appropriate for the constitution, modification, enforcement or compliance herewith or for the punishment of any violation hereof, or for such additional relief as may become necessary to realize the intentions of the Stipulated Protective Order.

20.     A party shall not be obligated to challenge the propriety of the designation of information as "Confidential" or "Confidential - Attorneys Eyes Only" at the time made, and failure to do so shall not preclude a later challenge thereof.  If a party challenges such a designation, it or they shall send or give notice to the other party and to any third party who designated the information as confidential and shall attempt in good faith to resolve any challenge on an expedited and informal basis.  Upon receipt of such notice, the party that designated the documents, material or information as "Confidential" or "Confidential - Attorneys Eyes Only" shall be required to state the basis for such designation in writing to the other party.  If the challenge cannot be expeditiously and informally resolved, either party may, on reasonable notice, apply for an appropriate ruling from the Court.  The party which designated such documents, material or information as "Confidential" or "Confidential - Attorneys Eyes Only" shall have the burden of proof as to the validity of each such designation; that party's burden shall be the same as required in the absence of a protective order. The documents, material or information at issue shall continue to be treated as "Confidential or "Confidential - Attorneys Eyes Only" until the Court orders

13

otherwise.

21.     Nothing herein shall prevent disclosure beyond the terms of this

Stipulated Protective Order if the party designating the information as

"Confidential" or "Confidential - Attorneys Eyes Only" consents to such

disclosure in a signed writing or if the Court, after notice to all affected parties,

orders such disclosure.  Nothing herein shall preclude any party, their attorneys or

any other person from disclosing or using, in any manner or for any purpose, any

information or documents obtained from another source, if such information is

lawfully (i.e., not in violation of any law, agreement, order, judgment or duty of

confidentiality) obtained from that source, such as a third party having the right to

disclose such information, even though the same information or documents may

have been produced in discovery in this lawsuit and designated as "Confidential"

or "Confidential - Attorneys Eyes Only."

22.     Sixty (60) days prior to the commencement of the trial of these actions

or at the time any listing of documents is filed with the Court pursuant to the Local

Rules of the Court, whichever is earlier, the requesting party shall notify the

producing party of its intention to disclose at trial any document or documents, or

portions thereof, designated CONFIDENTIAL under the terms of this Order and

shall identify such document or documents.  This period is provided to afford the

producing party the opportunity to seek any appropriate relief from such disclosure

to which it may be entitled.  This provision shall not prejudice the right of either

14

party to seek and obtain from the Court an earlier identification and designation of those CONFIDENTIAL documents which the requesting party intends to disclose at the trial of these actions.

23.     Within thirty days of the termination of this litigation, including all appeals there from, counsel for the requesting party shall destroy all material marked CONFIDENTIAL received hereunder, including all copies thereof, and certify to counsel for the producing party that these materials have been destroyed.

24.     The termination of proceedings in these actions shall not relieve any persons to whom confidential materials has been disclosed from the obligations of this Order, unless the Court orders otherwise.

25.     Nothing contained in the within Order shall preclude any party from seeking and obtaining, on an appropriate showing, additional protection with respect to the confidentiality of documents or other discovery material.

26.     The Court reserves full power and jurisdiction to modify, revise or rescind this Order at any time and from time to time, upon motion of any of the parties, or *sua sponte*.  IT IS SO ORDERED this _____ day of _____, 2013.

_____
United States District Judge